UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN ULRICH,

                              Plaintiff,                         No. 17-CV-4730 (KMK)

              v.                                                 <u>OPINION & ORDER</u>

SOFT DRINK, BREWERY WORKERS AND
DELIVERY EMPLOYEES, INDUSTRIAL
EMPLOYEES, WAREHOUSEMEN, HELPERS
AND MISCELLANEOUS WORKERS,
GREATER NEW YORK AND VICINITY,
LOCAL UNION NO. 812, et al.,

                              Defendants.

---

LAWRENCE DEBELLIS,

                              Plaintiff,                         No. 17-CV-5547 (KMK)

              v.

SOFT DRINK, BREWERY WORKERS AND
DELIVERY EMPLOYEES, INDUSTRIAL
EMPLOYEES, WAREHOUSEMEN, HELPERS
AND MISCELLANEOUS WORKERS,
GREATER NEW YORK AND VICINITY,
LOCAL UNION NO. 812, et al.,

                              Defendants.

---

<u>Appearances:</u>

Avram S. Turkel, Esq.
Ranadeb R. Mukherjee, Esq.
Borstein & Sheinbaum
New York, NY
*Counsel for Plaintiffs John Ulrich and Lawrence DeBellis*

Joseph J. Ranni, Esq.
Ranni Law Firm

Florida, NY
*Counsel for Plaintiffs John Ulrich and Lawrence DeBellis*

Larry Cary, Esq.
Tara L. Jensen, Esq.
Cary Kane LLP
New York, NY
*Counsel for Defendants Soft Drink & Brewery Workers Local 812 Pension Fund; Soft Drink & Brewery Workers and Delivery Employees, Industrial Employees, Warehousemen, Helpers and Miscellaneous Workers Greater New York and Vicinity Local Union No. 812; Soft Drink & Brewery Workers Local 812 Health Fund; Edward Weber, individually and in his official capacity as President of Soft Drink & Brewery Workers Teamsters Local 812, Trustee of Soft Drink & Brewery Workers Local 812 Pension Fund, and Chairman Trustee of Soft Drink & Brewery Workers Local 812 Health Fund; Joseph Vitta, individually and in his official capacity, as Secretary Treasurer of Soft Drink & Brewery Workers Local 812, Trustee of Soft Drink & Brewery Workers Local 812 Pension Fund, and Trustee of Soft Drink & Brewery Workers Local 812 Health Fund; James Surdi individually and in his official capacity as Recording Secretary of Soft Drink & Brewery Workers Local 812 and as Trustee of Soft Drink & Brewery Workers Local 812 Health Fund; Mario Alvarez, individually and in his official capacity as Trustee of Soft Drink & Brewery Workers Teamsters Local 812; Angel Martinez, individually and in his official capacity as Trustee of Soft Drink & Brewery Workers Local 812 Health Fund; John Visconti, individually and in his official capacity as Vice President of Soft Drink & Brewery Workers Local 812, Trustee of Soft Drink & Brewery Workers Local 812 Pension Fund, and Trustee of Soft Drink & Brewery Workers Local 812 Health Fund; Jeffrey Knatz, individually and in his official capacity as Trustee of Soft Drink & Brewery Workers Local 812 Health Fund; Thomas Starapoli, individually and in his official capacity as Trustee of Soft Drink & Brewery Workers Local 812 Health Fund; Artie Bowman, individually and in his official capacity as Trustee of Soft Drink & Brewery Workers Teamsters Local 812*

Mark E. Brossman, Esq.
Scott A. Gold, Esq.
New York, NY
Schulte Roth & Zabel LLP
*Counsel for Defendants Soft Drink & Brewery Workers Local 812 Pension Fund; Rod Brayman, individually and in his official capacity as Trustee of Soft Drink & Brewery Local 812 Pension Fund; Gerry Cottrell, individually and in his official capacity as Trustee of Soft Drink & Brewery Local 812 Pension Fund; and Michael Lorenca, individually and in his official capacity as Trustee of Soft Drink & Brewery Local 812 Pension Fund*

Russell L. Hirschhorn, Esq.
Proskauer Rose LLP
New York, NY
*Counsel for Defendants Soft Drink & Brewery Workers Local 812 Pension Fund; Rod Brayman, individually and in his official capacity as Trustee of Soft Drink & Brewery Local 812 Pension Fund; Gerry Cottrell, individually and in his official capacity as Trustee of Soft Drink &*

*Brewery Local 812 Pension Fund; and Michael Lorenca, individually and in his official capacity as Trustee of Soft Drink & Brewery Local 812 Pension Fund*

Richard M. Seltzer, Esq.
Bruce S. Levine, Esq.
Kate M. Swearengen, Esq.
Cohen, Weiss and Simon LLP
New York, NY
*Counsel for Defendants International Brotherhood of Teamsters; Joint Council 16; and Brad Raymond, individually and in his official capacity and Counsel for the International Brotherhood of Teamsters*

KENNETH M. KARAS, District Judge:

John Ulrich ("Ulrich") and Lawrence DeBellis ("DeBellis") (collectively, "Plaintiffs"), bring these Actions (respectively, Case Nos. 17-CV-4730 and 17-CV-5547), against Soft Drink & Brewery Workers and Delivery Employees, Industrial Employees, Warehousemen, Helpers and Miscellaneous Workers Greater New York and Vicinity Local Union No. 812 ("Local 812" or "Union"), Soft Drink & Brewery Workers Local 812 Health Fund, ("Health Fund"), Soft Drink & Brewery Workers Local 812 Pension Fund ("Pension Fund"), Edward Weber ("Weber"), individually and in his official capacity as President of Local 812, Trustee of the Pension Fund, and Chairman Trustee of the Health Fund, Joseph Vitta ("Vitta"), individually and in his official capacity, as Secretary Treasurer of Local 812, Trustee of the Pension Fund and of the Health Fund, John Visconti ("Visconti"), individually and in his official capacity as Vice President of Local 812, Trustee of the Pension Fund and of the Health Fund, Mario Alvarez ("Alvarez"), and Artie Bowman ("Bowman"), each individually and in his official capacity as Trustee of Local 812, and James Surdi ("Surdi"), individually and in his official capacity as Recording Secretary of Local 812 and as Trustee of the Health Fund, Angel Martinez ("Martinez"), Jeffrey Knatz ("Knatz"), and Thomas Starapoli ("Starapoli"), each individually and in their official capacity as Trustees of the Health Fund (collectively, "Local 812

Defendants"); Rod Brayman ("Brayman"), Gerry Cottrell ("Cottrell"), and Michael Lorenca ("Lorenca"), each individually and in their official capacity as Trustees of the Pension Fund (collectively, "Pension Fund Defendants"); and the International Brotherhood of Teamsters ("IBT"), Joint Council 16 ("JC 16"), and Brad Raymond ("Raymond"), individually and in his official capacity as Counsel for IBT (collectively, "IBT Defendants").[1]  (*See* Ulrich Am. Compl. (Case No. 17-CV-4730, Dkt. No. 30) and Decl. of Ran Mukherjee, Esq. re Ulrich ("Mukherjee Aff. re Ulrich"), Ex. 1 (Proposed Second Am. Compl. ("Ulrich PSAC")) (Case No. 17-CV-4730, Dkt. No. 54-1); DeBellis Am. Compl. (Case No. 17-CV-5547, Dkt. No. 18) and Decl. of Ran Mukherjee, Esq. re DeBellis ("Mukherjee Decl. re DeBellis"), Ex. 1 (Proposed Second Am. Compl. ("DeBellis PSAC")) (Case No. 17-CV-5547, Dkt. No. 46-1).)[2] [3]

Plaintiffs allege deprivation of due process in violation of Section 101(a) of the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 411(a)(5),

---

[1] The Court classifies the Defendants into three groups, namely the Union Defendants, the IBT Defendants, and the Pension Defendants, based on the fact that Defendants have submitted their papers as such.  The Court notes that for purposes of asserting claims, Plaintiffs classify the Defendants as follows: "Local 812 Defendants" include Local 812, Weber, Vitta, Surdi, Visconti, Martinez, Alvarez, Bowman, Knatz, and Starapoli, in their individual and official capacities.  "Health Fund Defendants" include the Health Fund, Weber, Vitta, Surdi, Visconti, Martinez, Alvarez, Knatz, and Starapoli, in their individual and official capacities. "Pension Fund Defendants" include IBT, the Pension Fund, Weber, Vitta, Visconti, Brayman, Cottrell, Lorenca, Surdi, Martinez, Alvarez, Knatz, and Starapoli, in their individual and official capacities.  "JC 16 Defendants" include JC 16.  "IBT Defendants" include IBT and Raymond, in his individual and official capacity.  (Ulrich Am. Compl. ¶¶ 117–21; DeBellis Am. Compl. ¶¶ 80–84.)

[2] Plaintiffs' Counsel attached the PSACs and blackline copies comparing the PSACs to Plaintiffs' Amended Complaints.  (*See* Mukherjee Aff. re Ulrich, Ex. 2 (Ulrich PSAC Blackline) (Case No. 17-CV-4730, Dkt. No. 54-2); Mukherjee Decl. re DeBellis, Ex. 2 (DeBellis PSAC Blackline) (Case No. 17-CV-5547, Dkt. No. 46-2).)

[3] Bowman is named as a Defendant only by DeBellis, not by Ulrich. (*See* DeBellis Am. Compl.; DeBellis PSAC; Ulrich Am. Compl.; Ulrich PSAC.)

deprivation of due process and a breach of contract in violation of Section 301(a) of the Labor Management Relations (Taft-Hartley) Act ("LMRA"), 29 U.S.C. § 185(a), violations of their free speech and freedom of assembly rights under Title I of the LMRDA, 29 U.S.C. § 411(a)(2), retaliation in violation of Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140, breach of fiduciary duty in violation of Section 404 of ERISA, 29 U.S.C. §§ 1104, 1106, retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and state law defamation, in connection with Plaintiffs' termination from their Union jobs and their roles as Trustees with the Health and Pension Funds. (*See generally* Ulrich PSAC; DeBellis PSAC.) Before the Court are Plaintiffs' Motions for Leave to Amend their Second Amended Complaints. (*See* Case No. 17-CV-4730, Ulrich Not. of Mot. (Dkt. No. 53); Case No. 17-CV-5547, DeBellis Not. of Mot. (Dkt. No. 45).)[4] For the following reasons, Plaintiffs' Motions are denied.

---

[4] Ulrich and DeBellis's cases are related as they involve substantially the same parties, facts, and legal issues. (*See* Case No. 17-CV-5547, Dkt. No. 13; Dkt. (entry for Sept. 7, 2017).) With the exception of some factual differences with respect to Plaintiffs' job titles and their allegations against Defendants, the facts giving rise to the claims in these Actions, and the claims themselves, are identical. The Court therefore addresses Plaintiffs' Motions together.

The Court notes that these cases are related to Case No. 17-CV-137, in which Local 812 is suing Ulrich. (*See* Case No. 17-CV-137, Dkt. No. 1.) Ulrich's case is also related to Case No. 17-CV-7023, in which the Health Fund is suing Ulrich. (*See* Case No. 17-CV-7023, Dkt. No. 1.) There have been no developments in those Actions pending the outcome of Ulrich and DeBellis's Motions to Amend.

A.  Factual Background

The following facts are taken from Plaintiffs' PSACs and are assumed to be true for purposes of resolving the instant Motions.[5]

### 1.  Ulrich and DeBellis's Employment with Local 812

Ulrich was employed as an elected Vice President of Local 812, as well as a Trustee of both the Pension and Health Funds.  (Ulrich PSAC ¶ 24.)  DeBellis was employed as an elected Business Agent of Local 812, as well as a Trustee of the Health Fund.  DeBellis was recommended to be a Business Agent by Ulrich, with whom he was known to associate. (DeBellis PSAC ¶ 24.)

Ulrich has a long history with the Union.  In 1989, he was hired by H.P. Hood Company as a driver and became a Teamster member.  (Ulrich PSAC ¶ 28.)  He became a member of Local 812 in 1994 while employed by Coca Cola as a Route Salesman, and thereafter became an elected shop steward and Local 812 representative in 1995.  (*Id*. ¶ 29.)  In 2000, Ulrich was hired as a Distribution Supervisor at his facility at Coca Cola in New Windsor, New York.  (*Id*. ¶ 30.) On September 1, 2004, he became employed by Local 812 as Director of Organizing and Education for Defendant Local 812 and joined the Local 812 Executive Board ("Executive Board" or "Board") as a nonvoting member.  (*Id*. ¶ 31.)  In 2005, Ulrich became a Local 812 Business Agent and the lead negotiator for Defendant Local 812.  (*Id*. ¶ 32.)  In 2006, he was appointed as a Health Fund Trustee.  (*Id*. ¶ 33.)  On April 19, 2011, he was appointed a full Trustee for the Union following the paid suspension in February of the former President Joseph

---

[5] The Court will note where Plaintiffs' PSACs add, delete, or change the facts as described in Plaintiffs' Amended Complaints.

Wojciechowski ("Wojciechowski") and the removal of the Secretary/Treasurer Thomas Rosano

("Rosano"), who were investigated for embezzlement, extortion, and fraud.  (*Id*. ¶ 34.)  That

same day, on April 19, 2011, in an Executive Board meeting, Thomas Thompson ("Thompson"),

the attorney who had represented the ousted President and Secretary/Treasurer, was removed as

Union, Health Fund, and Pension Fund Counsel.  (*Id*.)

The Teamsters Independent Review Board ("IRB") is a three-member panel established

to investigate and take appropriate action with respect to any allegations of corruption,

domination or control, or influence of any part of the Union by organized crime, as well as any

failure to cooperate fully with the IRB.  (Ulrich PSAC ¶ 35.)  On October 11, 2011,

Wojciechowski was formally removed as Local 812 President at the direction of the IRB.  (*Id*.

¶ 36.)

In November 2011, Ulrich was elected by the Local 812 General Membership ("General

Membership") as Recording Secretary and sworn in on January 1, 2012.  (*Id*. ¶ 37.)  In

November 2014, he was elected by the Local 812 General Membership as Vice President and

sworn in on January 1, 2015.  (*Id*. ¶ 38.)  In March 2015, Ulrich was appointed Trustee to the

Pension Fund.  (*Id*. ¶ 39.)  Ulrich received the salary of an elected Salaried Vice President, an

expense account, a car allowance, health benefits, life insurance, retirement, disability benefits, a

401K, and other employment benefits.  (*Id*. ¶ 40.)

According to Ulrich, DeBellis was appointed as a Local 812 Business Agent in December

2014, replacing the elected position of Warren Marsh ("Marsh") who was ill and not working.

(*Id*. ¶ 41.)  DeBellis, by virtue of his appointment, also became a Health Fund Trustee.  (*Id*.)

Notably, DeBellis alleges that he was appointed a Business Agent and became a Health Fund

Trustee in December 2013, not 2014.  (DeBellis PSAC ¶ 33.)

On January 1, 2015, Ulrich alleges DeBellis was "appointed" as an elected Salaried Trustee and Business Agent according to the Local 812 By-laws, replacing the elected position of Marsh. (Ulrich PSAC ¶ 42.) DeBellis alleges he was "elected as an Officer, Business Agent and Trustee according to the Local 812 By-laws and continued on the Union Executive Board and Health Fund Trustee." (DeBellis PSAC ¶ 35.)

### 2. Local 812, Health Fund, and Pension Fund Meetings

During all relevant times, the Local 812 Executive Board met once a month and was comprised of Local 812 elected officers, including the President, Vice President, Secretary, Treasurer, Recording Secretary, three Elected Union Trustees, and appointed Business Agents or Directors, Non-Paid Trustees, Paid Trustees, and/or Weber, Vitta, John Cotoggio ("Cotoggio"), Marsh, Ulrich, Visconti, DeBellis, Alvarez, Surdi, and Martinez. (Ulrich PSAC ¶ 42; DeBellis PSAC ¶ 34.) During the meetings, the Executive Board discussed various matters, including but not limited to, potential and/or on-going contract negotiations, the activities of each Board Member during the preceding month, approval of individual member expenses, and other general union business. (Ulrich PSAC ¶ 45; DeBellis PSAC ¶ 37.)

The Local 812 Executive Board met with the General Membership at a meeting held once a month. (Ulrich PSAC ¶ 41; DeBellis PSAC ¶ 33.) The attendees at that meeting were the Local 812 General Membership, and Elected Officers and Trustees comprised of Weber, Vitta, Cotoggio, Marsh, Ulrich, Visconti, DeBellis, Alvarez, Surdi, and Martinez. The Executive Board was also able to call special meetings pursuant to Local 812 By-laws. (*Id.*; *Id.*)

The Local 812 Pension Fund Trustees conducted meetings held once a quarter or by calling a special meeting. (Ulrich PSAC ¶ 43.) The Local 812 Health Fund conducted meetings comprised of all Union Officers and Business Agents, except non-paid Trustee Alvarez, once a

quarter or by special meeting. (*Id.* ¶ 44.) It was customary to provide an agenda with prior notice and to include meeting minutes from the last meeting. (*Id.* ¶ 45; DeBellis PSAC ¶ 37.)

### 3. Ulrich's Allegations of Misconduct Against Weber, Vitta, and Surdi

In or around September or October 2015, while on disability leave, Ulrich attended a shop steward seminar in which he informed a number of union members of suspected misconduct by Local 812 Defendants Weber and Vitta, among others, including but not limited to the improper hiring of family members, the improper granting of benefits, the improper hiring of a secretary without Board approval and in exchange for sexual favors, and the improper use of Health Fund resources. (Ulrich PSAC ¶ 46.) At that time, Ulrich and DeBellis also informed "these union members" of their intention to run against Defendants Weber and Vitta in the next elections to be held in 2017. (*Id.*)[6]

In November 2015, upon returning from disability leave, Ulrich additionally learned that Weber, Vitta, and Surdi had negotiated a collective bargaining agreement involving BettaWay Traffic Systems in 2013, in violation of the IBT Constitution and Local 812 By-laws. (*Id.*) In particular, Ulrich alleges that Weber, Vitta, and Surdi improperly negotiated a new union contract with BettaWay Distributors ("BettaWay") even though the then-existing contract, signed on June 1, 2012, was not due to expire until May 31, 2017. (*Id.* ¶ 47.) Weber, Vitta, and Surdi helped BettaWay to split and create non-union company BettaWay Traffic Systems to employ persons who would otherwise contractually and historically be required to participate in the Local 812 Pension Fund, but who through the new non-union company, did not have to

---

[6] Allegations about the September or October 2015 meeting, including Ulrich and DeBellis informing union members of alleged misconduct, and that they were running for office, were not in Ulrich's Amended Complaint but were added to his PSAC. (*See* Ulrich PSAC Blackline ¶ 46.)

contribute to Local 812's Pension Fund.  (*Id*.)  Ulrich alleges that this exacerbated the problems at Local 812's already underfunded Pension Fund by a projected $2.4 million and violated the Local 812 Retirement Fund Plan Document.  (*Id*.)  DeBellis alleges that he learned about this improper BettaWay contract at some later unspecified time.  (DeBellis PSAC ¶ 77.)

Ulrich alleges he made complaints in September 2014, October 2014, December 2014, May 2015, November 2015, and December 2015 about sexual harassment, improper payment of health benefits, and misuse of Union Health and Pension Funds.  (Ulrich PSAC ¶ 48.) Specifically, Ulrich alleges that Weber, Vitta, Alvarez's wife, and Marsh all received medical treatment not covered by the Local 812 Health Fund administered by Crossroads Healthcare Management LLP ("Crossroads") and Proscript Pharmacy LLP ("Proscript"), and caused the Health Fund to assume the costs anyway.  (*Id*. ¶¶ 49–50, 52.)  Ulrich allegedly complained to Weber about these improper activities and argued that the Union and Health Fund were obligated to address them.  (*Id*. ¶ 51.)[7]

Ulrich also alleges that he witnessed Vitta engage in sexual harassment of two female subordinate employees on several occasions beginning in September 2014.  (*Id*. ¶ 53.)  The conduct allegedly included sexually offensive comments, non-verbal conduct, and sexually inappropriate touching.  (*Id*.)  Both female employees allegedly complained about Vitta's conduct, one directly to Ulrich.  Ulrich escalated the complaint to Weber in or about September or October 2014, May 2015, and December 2015.  (*Id*.)  Ulrich alleges that the complaint was not accepted in good faith, was not investigated, and no appropriate corrective action was taken. (*Id*.)

---

[7] The Court notes that Ulrich does not specifically allege when he raised each of these complaints with Weber.

On or about December 2, 2015, Ulrich advised Weber of his intention to inform the Executive Board, IRB, the 812 Pension Management Trustees, and the Local 812 General Membership of the second BettaWay Traffic Systems Contract and to escalate his prior complaints including but not limited to sexual harassment by Vitta against subordinates, and Weber, Vitta, and Alvarez's improper use of health funds. (Ulrich PSAC ¶ 48.) Ulrich "reasonably believed in good faith that the conduct he described violated federal and state law, the 812 By-laws and IBT Constitution." (*Id*. ¶ 54.) Ulrich advised Weber that he was left with no choice and that he would not support him in the next election due to these infractions. (*Id*.) Ulrich further alleges that by this point, Weber and Vitta had been advised of his intention to oppose them in the November 2017 election. (*Id*.)

Ulrich alleges that Vitta learned that he intended to escalate the complaints and address them at the Executive Board meeting. (*Id*. ¶ 55.) On December 4, 2015, Vitta confronted Ulrich prior to the Board meeting and said, "I'm telling you now, I'm not going through another []IRB[] investigation," referencing that Vitta had previously been suspended by the IRB for lying under oath during a previous investigation. (*Id*.) Vitta told Ulrich not to bring up his accusations in the Executive Board meeting, to give him some time, and that they would discuss the accusations later. (*Id*.)

### 4. Local 812 Investigation of Ulrich

During all relevant times, attorney Roland Acevedo ("Acevedo") represented third-party Health Plan Administrators Crossroads and Proscript, as well as their principals Michael DeBartalome ("DeBartalome") and Partick Paolucci ("Paolucci"). (Ulrich PSAC ¶ 56.) On December 10, 2015 Acevedo was retained by Local 812 in a "vague writing" to investigate, though no particular subject matter was specified and no monetary payment was made. (Ulrich

PSAC ¶ 57; DeBellis PSAC ¶ 39.)  Plaintiffs allege that neither Weber nor Vitta had authority to retain Acevedo without Executive Board approval, which was not sought.  (*Id.*; *Id.*)

Plaintiffs were not advised of this investigation nor had any meeting concerning the investigation.  (Ulrich PSAC ¶ 57.)  However, Weber and Vitta discussed the purported investigation with at least Executive Board Members Surdi and Visconti.  (Ulrich PSAC ¶ 57; DeBellis PSAC ¶ 39.)[8]

DeBellis was not aware that Weber and Vitta retained Acevedo in December 2015 to conduct an open-ended investigation into him and Ulrich.  (DeBellis PSAC ¶ 25.)[9]  At this point, DeBellis had already been deposed by Acevedo about the sexual harassment incidents DeBellis had witnessed.  (*Id.* ¶ 26.)  During that deposition, DeBellis was not asked about any purported bribe-taking.  (*Id.*)  After the deposition, Weber and Vitta allegedly told other Business Agents not to speak with DeBellis.  (*Id.*)

---

[8] In their Amended Complaints, Ulrich and DeBellis described the nature of this investigation in greater detail.  They alleged that in or about late November 2015, Weber and Vitta were notified by DeBartolome, a principle at Crossroads/Proscript, that Paolucci, his co-principle at Crossroads/Proscript, was purportedly paying bribes to Ulrich and DeBellis.  (Ulrich Am. Compl. ¶ 57; DeBellis Am. Compl. ¶ 39.)  Thousands of dollars of bribes had purportedly been paid over several years.  (Ulrich Am. Compl. ¶ 57; DeBellis Am. Compl. ¶ 39.)  DeBartolome recommended Crossroads/Proscript attorney Acevedo to investigate the bribes.  (*Id.*; *Id.*)  Acevedo, DeBartalome, Weber, and Vitta met a week later and again discussed the allegations.  (Ulrich Am. Compl. ¶ 58; DeBellis Am. Compl. ¶ 40.)  Acevedo began his investigation on December 4, 2015.  (Ulrich Am. Compl. ¶ 58; DeBellis Am. Compl. ¶ 40.)  Ulrich alleged Acevedo, DeBartalome, Weber, and Vitta did not discuss the details of the bribe payments or the ethical implications of retaining the attorney representing the purported bribe payers in investigating those bribes.  (Ulrich Am. Compl. ¶ 58.)  These allegations do not appear in the PSACs.

[9] In his Amended Complaint, DeBellis alleged that investigation related to Ulrich and DeBellis allegedly taking bribes from Paolluci, and includes details about a meeting that took place between Weber, Vitta, DeBartolome, and Acevedo, at which Local 812 decided to retain Acevedo.  (DeBellis Am. Compl. ¶ 25.)  These allegations do not appear in DeBellis's PSAC.

On January 11, 2016, Ulrich learned an investigation had been commenced against him for undefined "misconduct." (Ulrich PSAC ¶ 58.) Though Local 812 By-laws required specific due process procedures including requiring notice of allegations of wrongdoing and written charges, and Board approval to retain an investigator, attorneys or accountants, none of these procedural requirements was met. According to Ulrich, Acevedo had not been properly appointed or approved under the Local 812 By-laws and IBT Constitution. (*Id*.) On January 11, 2016, DeBellis received a call from Acevedo directing him to come in for a sworn deposition on January 14, 2016. (DeBellis PSAC ¶ 40.)

On or about January 11, 2016, Acevedo, claiming to be an attorney and investigator for IBT, telephoned Ulrich and instructed him to appear for a deposition under oath on January 14, 2016. (Ulrich PSAC ¶ 59.) Acevedo warned Ulrich that he would be terminated from Local 812 and be barred for life from IBT if he did not comply. (*Id*.) Acevedo refused to advise Ulrich whether charges had been filed, specify what allegations were being leveled against him, or tell him what the nature of the investigation was. No notice of documentation or production was provided to Ulrich before the deposition. (*Id*.)

Between January 12 and January 16, 2016, Ulrich filed charges with Local 812 counsel of record against Weber and Vitta regarding conduct such as sexual harassment, the hiring of family members, hiring of staff without approval, "no approval of increases," and intimidating a shop steward in violation of the IBT Constitution, Local 812 By-laws, and/or IRB requirements. (Ulrich PSAC ¶ 60.)

On January 13, 2016, Ulrich sent a letter referencing sexual harassment involving Vitta, in which DeBellis was named as a witness. (DeBellis PSAC ¶ 41.) On January 14, 2016, Vitta approached DeBellis and asked, "are you going to testify against me?" (*Id*. ¶ 42.) DeBellis did

not know about the subject of the investigation until he was before Acevedo during the deposition on January 14, 2016. DeBellis was not asked about any alleged bribe-taking; he was only asked about the sexual harassment he allegedly witnessed. (*Id*.) DeBellis alleges that Acevedo told him that giving any testimony Acevedo believed to be untrue would result in DeBellis being banned from IBT for life, "coast to coast." (*Id*.) During the deposition, Acevedo told DeBellis that they were not after him as he was a hard-working man. (*Id*.) On January 15, 2016, after DeBellis's deposition, Weber and Vitta told other business agents not to speak to DeBellis. (*Id*. ¶ 43.) DeBellis thereafter worked alone from January 15, 2016 to February 9, 2016. (*Id*.)

On January 15, 2016, Ulrich sent an email stating Acevedo had not been properly appointed as investigator pursuant to Local 812 By-Laws and that such appointment could only occur during an open meeting. (Ulrich PSAC ¶ 61.) During this time, Weber and Vitta were engaging in private meetings with Defendant Local 812 Board Members and Health Fund Trustees from which Ulrich and DeBellis were excluded. (*Id*.) On January 16, 2016, Ulrich, through counsel, escalated his complaints concerning BettaWay Traffic Systems and improper benefit payments to JC 16, IBT, and the IRB. (*Id*. ¶ 62.) That same day, Weber held a private meeting in a restaurant with all members of the Executive Board except Ulrich and DeBellis, who were allegedly intentionally excluded. (Ulrich PSAC ¶ 63; DeBellis PSAC ¶ 45.)

On January 17, 2016, Weber emailed a notice for a special Executive Board meeting to be held on January 19, 2016, but did not provide an agenda or offer a reason for the meeting. (Ulrich PSAC ¶ 63; DeBellis PSAC ¶ 46.)

On January 18, 2016, Douglas Grover ("Grover"), Ulrich's attorney, sent a letter to Weber again raising Ulrich's complaints of Weber, Surdi, and Vitta's misconduct, Acevedo's

conflict of interest, and the Bettaway contract.  (Ulrich PSAC ¶ 65.)  Grover noted that there was still no issuance of allegations or specific charges against Ulrich even though he had already been threatened with termination.  (*Id*.)

At the Executive Board meeting on January 19, 2016, the Board authorized Acevedo to investigate.  The meeting lasted less than 10 minutes without debate and union counsel was not present.  There was no discussion of Acevedo's conflict of interest.  Ulrich and DeBellis voted against hiring Acevedo.  (Ulrich PSAC ¶ 66; DeBellis PSAC ¶ 47.)  No allegations or charges against Ulrich were submitted verbally or in writing, and Ulrich was not permitted to speak or bring forward an investigation regarding his charges against Defendants.  (*Id*.; *Id*.)

On January 20, 2016, Grover objected to the Executive Board "hearing" against Ulrich as the Executive Board Members were the subjects of charges filed by Ulrich on January 16, 2016. (Ulrich PSAC ¶ 67.)

On January 21, 2016, Acevedo deposed Ulrich as part of the investigation, but did not provide any prior notice as to the purpose of the investigation, no information regarding the allegations against Ulrich, and no written or verbal charges against Ulrich.  (*Id*. ¶ 68.)  Acevedo did not question Ulrich about purported bribes, which was the reason Defendants later gave for Ulrich's termination.  (*Id*.)

On January 22, 2016, Grover sent a cease and desist letter to John Russo ("Russo"), a former Vice President and Local 812 Retiree, who had been allowed into company facilities at the direction of Weber and Vitta to spread rumors and to make defamatory remarks against Ulrich and DeBellis.  (*Id*. ¶ 69.)[10]

---

[10] In his Amended Complaint, Ulrich alleged that the rumors Russo spread were related to Ulrich's alleged guilt and the defamatory remarks were against Ulrich and DeBellis for

On January 28, 2016, Ulrich was locked out of the offices of Local 812 without prior notice, at a time before any allegations or charges had been filed, and while he was still an elected Vice President. Ulrich alleges he was thus barred from meetings and interaction with the membership. (Ulrich PSAC ¶ 70.) Also, on January 28, 2016, Ulrich was told by Shop Steward Richard Alotta at Anheuser Busch, in the Bronx, New York, that union member Ray Voigt said he spoke to Martinez and Vitta who said they had first-hand knowledge that there was a deal or kickbacks between Ulrich and Paolucci at Crossroads. (*Id.* ¶ 71.) The allegations against Ulrich were that he had accepted thousands of dollars' worth of bribes from Paolucci and DeBartolome per quarter. (*Id.*) This was the first time Ulrich became aware of the bribery allegations that would later become the reasons Defendants gave for terminating him. (*Id.*)[11]

On January 29, 2016, Grover sent a letter to the IRB again raising Ulrich's complaints of impropriety including but not limited to the BettaWay agreement. (*Id.* ¶ 72.)

Ulrich alleges that he and DeBellis were the only persons among several who testified who did so under oath and with stenographic reporting. (*Id.* ¶ 68.) Ulrich alleges that Acevedo neither investigated nor properly referred his complaints about Defendants, even though Acevedo, Weber, and Vitta, had discussions relative to both Ulrich's complaints and the status of the investigation against Ulrich. (*Id.*) Ulrich further alleges that in or about January 2016 he advised the Pension Fund of Weber and Vitta's misconduct, and he believes that all Pension Fund Trustees were advised of his whistleblower complaints but did not investigate. (*Id.* ¶ 107.)

---

allegedly taking bribes. (Ulrich Am. Compl. ¶ 71.) These allegations do not appear in Ulrich's PSAC.

[11] Allegations about how Ulrich learned about the charges against him were not in Ulrich's Amended Complaint and were added to the PSAC. (Ulrich PSAC Blackline ¶ 71.)

During this time, Ulrich also communicated individually with Pension Fund Board Members concerning Weber and Vitta's misconduct. (*Id.* ¶ 108.)

On February 1, 2016, Weber filed charges against Ulrich alleging misuse of the Union credit card on four occasions over a three-year period. (Ulrich PSAC ¶ 73.) Ulrich alleges that every Board Member's expense accounts were analyzed by the Comptroller and reviewed and approved at the monthly meetings. (*Id.*) Receipts and expense accounts were also audited each year by IBT and the IRB on occasion. At no time prior to Weber's February 1, 2016 allegations, were any of Ulrich's expenses declined or questioned during any meeting or by any greater authority. (*Id.*)

On February 2, 2016, Paolucci contacted Ulrich three times and requested a meeting. (*Id.* ¶ 74.) At the meeting Paolucci "spoke cryptically," demanded Ulrich resign, and claimed that Acevedo had disclosed to him that DeBellis admitted he was taking bribes when questioned under oath at the offices of Local 812 by Acevedo. Ulrich later learned DeBellis gave no such testimony. (*Id.*)

On February 3, 2016, Vitta sent a letter to Ulrich rejecting the "various charges" Ulrich had brought against Weber and Vitta and claiming they were filed incorrectly. (*Id.* ¶ 75.) Vitta later claimed the charges had been directed to the wrong person and unsupported by credible evidentiary submissions and were therefore not accepted. (*Id.*) Ulrich alleges he indeed submitted sufficient supporting information consistent with policy and procedure. (*Id.*)

On February 4, 2016, JC 16 assumed jurisdiction of the charges filed by Weber against Ulrich on February 1, 2016, thereby denying Local 812 the ability to hear the disciplinary charges against Ulrich. (*Id.* ¶ 76.) On February 4 and February 8, 2016, Grover sent letters to

Local 812 and to JC 16 respectively, seeking an investigation regarding the meeting Ulrich had with Paolucci. (*Id.* ¶ 77.)

Ulrich alleges that meetings continued to occur with other Board Members and Trustees concerning Ulrich's allegations against Defendants, union business, Acevedo's investigation, and Ulrich's alleged taking of bribes. (Ulrich PSAC ¶ 78.) In the first week of February 2016, Surdi told members at the Coke Elmsford Production location that he "loves" Ulrich and was "his biggest fan and supporter, but [that] what he did [was] really bad . . . ." (*Id.*)

Between February 7 and February 10, 2016, Acevedo communicated directly with his then client Paolucci and/or attorney Thompson regarding claims that Paolucci was paying bribes to Ulrich. (*Id.* ¶ 79.) These communications were reported to Walter Kane ("Kane"), attorney for the Health Fund. None of this information was communicated to Ulrich or his counsel. (*Id.*) At that time both Acevedo and Thompson jointly represented Paolucci, DeBartalome, and Crossroads/Proscript. (*Id.*) DeBellis alleges they also discussed his association with Ulrich. (DeBellis PSAC ¶ 48.)

On February 8, 2016, DeBellis was again questioned, although unsworn, by another unspecified attorney concerning his being a witness to sexual harassment by Vitta. (*Id.* ¶ 49.)

DeBellis alleges that between January 15, 2016, and February 9, 2016, the Union Board Members talked to the membership during working hours to slander Ulrich. Closer to February 2016 they also started slandering DeBellis to the membership. (*Id.* ¶ 44.)

### 5. Feb. 10, 2016 Health Fund Meeting and Local 812 Executive Board Meeting

On February 9, 2016, Kane received correspondence from attorney Thompson, the former Local 812 attorney who had been terminated at Ulrich's insistence, alleging that Ulrich and another Executive Board Member, "LD," had been extorting bribes over a three-year period

totaling between $8,000 and $11,000 per quarter.  (Ulrich PSAC ¶ 82; DeBellis PSAC ¶ 52.)

The Defendants identified "LD" as DeBellis.  (Ulrich PSAC ¶ 82.)  Kane did not disclose the

topics of the meeting to Ulrich or DeBellis though he already had notice of the purported claims

of bribe taking.  This information was, however, allegedly disclosed to Weber, Vitta and other

Board Members and Trustees.  (Ulrich PSAC ¶ 81; DeBellis PSAC ¶ 51.)  Kane spoke with

Grover on February 9, 2016, but did not disclose receiving the Thompson letter or that the

subject of the meeting would be purported bribe-taking by Ulrich.  (Ulrich PSAC ¶ 82.)  No

notice was given to Ulrich, DeBellis, Executive Board Officers or Members that this was an

agenda item at an impending meeting and no charges to that effect were alleged or pending

against Ulrich or DeBellis.  (*Id*.)

On February 10, 2016, Ulrich emailed Kane that he was appearing at the meeting by

phone and requested that, because this was to be a Local 812 Executive Board meeting, Local

812 counsel be present.  (*Id*. ¶ 83.)  DeBellis had contacted Weber via text on February 9, 2016,

to tell him he had a death in the family and would not work on February 10, February 11, or

February 12, 2016.  (DeBellis PSAC ¶ 50.)  DeBellis advised he would appear at the meeting by

phone as he had to attend the funeral.  (Ulrich PSAC ¶ 83.)

Kane was not union counsel and Weber and/or Kane refused requests by Ulrich that

Local 812 Counsel be present for the meeting.  Consequently, the Local 812 Executive Board

meeting was held without union counsel being present.  (*Id*.)

When the meetings commenced, the Health Fund Trustees convened first, and the subject

of the meeting became whether Ulrich and DeBellis were taking bribes.  (*Id*. ¶ 85; DeBellis

PSAC ¶ 54.)  Plaintiffs allege that Kane "changed the purpose" of the special Health Fund

meeting from discussing Ulrich's allegations against Defendants, to a "hearing" about Ulrich and

DeBellis's alleged bribe taking.  (Ulrich PSAC ¶ 84; DeBellis PSAC ¶ 53.)  At the hearing, the letter from attorney Thompson and two attachments were distributed to those physically present. No agenda was prepared or distributed for either the Health Fund or Executive Board meeting. (*Id*.; *Id*.)

Ulrich and DeBellis received no prior notice, no written charges, no opportunity to contest the claims, no opportunity to review the evidence presented against them, and no opportunity to present evidence in their defense.  (Ulrich PSAC ¶ 85; DeBellis PSAC ¶ 27.) Though it was known that Ulrich and DeBellis were appearing by phone, no attempt was made to provide the Thompson letter and Paolucci's email to Ulrich or DeBellis until 15 minutes into the meeting when they were emailed while the meeting was ongoing.  (Ulrich PSAC ¶ 86; DeBellis PSAC ¶ 55.)

DeBellis alleges that at the February 10, 2016 meeting, no evidence was presented that bribes were paid, and no inquiry was made about the amount or method of bribe payments. (DeBellis PSAC ¶ 27.)  Nobody questioned how Acevedo, who represented the alleged bribe payer, could investigate whether bribes were paid.  (*Id*.)  DeBellis alleges that he objected to the process, reiterated he had no idea what they were talking about as he never gave or took anything, and stated that did not understand why he was "getting dragged into this."  (*Id*. ¶ 55.)

Ulrich reiterated his complaints about the process he was given, questioned why his allegations were not investigated, and objected to the lack of due process.  (Ulrich PSAC ¶ 86.) Kane advised that he would investigate Ulrich's complaints, and that if any illegalities or improprieties were found, they would be prosecuted and pursued.  (*Id*. ¶ 86; DeBellis PSAC ¶ 55.)  Ulrich alleges that neither Local 812, the Health Fund, nor Kane ever investigated the allegations Ulrich raised against Defendants.  (*Id*.; *Id*.)

At the conclusion of Kane's "inquiry," which constituted the whole of the "hearing," a vote was taken without debate or discussion and both Ulrich and DeBellis were "suspended" as Trustees of the Health Fund. (Ulrich PSAC ¶ 86; DeBellis PSAC ¶¶ 27, 55.) Their suspension was characterized as a "removal from all duties." (Ulrich PSAC ¶ 24; DeBellis PSAC ¶ 27.)

Then a vote was taken and the members elected to notify the IRB, the United States Attorney's Office, the Department of Labor, and other prosecutorial agencies about Ulrich and DeBellis's alleged illegal conduct. (Ulrich PSAC ¶ 86.)

Immediately following the Health Fund meeting, the Local 812 Executive Board met. Both Ulrich and DeBellis were summarily and without due process "suspended" from their positions. (*Id*. ¶ 87; DeBellis PSAC ¶ 56.) Ulrich and DeBellis were not given any time to prepare, nor were they given any opportunity to contest the claims against them or present evidence. (*Id*.; *Id*.)[12]

Notably, Board Member Alvarez, was not present for the Health Fund "hearing," and only joined immediately before the Local 812 Executive Board vote. (*Id*.; *Id*.) Notwithstanding, the Executive Board voted to "suspend" Ulrich and DeBellis without further discussion. (Ulrich PSAC ¶ 87.) Kane stated that Ulrich and DeBellis were "removed" and terminated from both Local 812 and the Health Fund. (Ulrich PSAC ¶ 87; DeBellis PSAC ¶ 56.)

All of Plaintiffs' duties, privileges, and compensation were back-dated as terminated on February 9, 2016. (*Id*.; *Id*.) Consequently, Ulrich alleges he was prevented from attending Local 812 meetings. (Ulrich PSAC ¶ 87.)

---

[12] Allegations about Ulrich and DeBellis not being given time to prepare before the Local 812 Executive Board meeting were not in Ulrich's Amended Complaint and were added to the PSAC. (Ulrich PSAC Blackline ¶ 87; DeBellis Am. Compl. ¶ 58.)

Additionally, Local 812 caused Ulrich to cease his position as a Pension Fund Trustee by virtue of his dismissal as Vice President. (*Id*.) Ulrich was never officially advised that he was removed as a Trustee of the Pension Fund, but since February 10, 2016, he has not received any notice of meetings, communications or Pension fund business, and for all intents and purposes has been removed de facto. (Ulrich PSAC ¶ 88.) Ulrich alleged that this was done to prevent him from protecting his pension fund rights, and to keep him from interfering with the fraud Defendants were perpetuating upon the Pension Fund and their appropriation or reduction of certain benefits. (*Id*.)

### 6. Post-Termination Allegations

On February 12, 2016, the IRB sent a letter to Ulrich's attorney Grover informing him that the charges regarding bribe-taking were being withdrawn by Local 812. (Ulrich PSAC ¶ 91.) On February 16, 2016, Ulrich sent a letter to JC 16, appealing the decision to terminate him from his position. (*Id*. ¶ 92.) JC 16 declined to review his appeal, stating it did not have jurisdiction to review his termination. (*Id*.)

JC 16, at the request of Weber, adjourned the first JC 16 hearing regarding the remaining charges brought against Ulrich, to permit Weber and Local 812 to amend them. (*Id*.) However, Ulrich alleges that the amended charges were not properly or timely submitted in accordance with the Local 812 Constitution. (*Id*. ¶¶ 92, 94.)

On February 16, 2016, DeBellis sent an appeal letter to JC 16 for reinstatement. JC 16 responded that it did not have authority to review the Local 812 termination decision. (DeBellis PSAC ¶ 57.) Additionally, union members received communication that they were neither to speak to nor meet with DeBellis. (*Id*.)

At the General Membership meeting held on February 18, 2016, flyers and letters were handed out claiming that Ulrich and DeBellis had taken kickbacks. (Ulrich PSAC ¶ 93; DeBellis PSAC ¶ 58.) During the meeting, Russo told DeBellis that he had taken "the wrong side" and threatened his pension and medical benefits unless DeBellis contacted him prior to a scheduled IRB hearing. (*Id.*; *Id.*)

On February 19, 2016, JC 16 sent a letter to Ulrich advising him that the February 22, 2016 IRB hearing on Local 812's February 1, 2016 charges against him was being adjourned at the request of Weber to allow Local 812 to bring additional charges against him. (Ulrich PSAC ¶ 94.)

On February 22, 2016, Vitta served amended charges by Local 812 and JC 16 against Ulrich. (*Id.* ¶ 95.) The original charge of bribe-taking had been withdrawn. (*Id.*) Ulrich does not allege or explain what charges remained against him. On February 23, 2016, Vitta sent a letter stating Weber's charges were withdrawn. (DeBellis PSAC ¶ 60.) On February 25, 2016, Vitta emailed DeBellis that Weber's charges were withdrawn. (*Id.* ¶ 61.)

On February 25, 2016, Matthew Brief, attorney for IRB, requested transcripts from Acevedo concerning his investigation of Ulrich. That request was declined and referred to Kane who ultimately did not respond. (*Id.* ¶ 62.) On February 29, 2016, Kane sent a letter to Grover regarding Ulrich's termination from his positions and the withdrawal of the purported bribery charges. (Ulrich PSAC ¶ 96.)

On March 3, 2016, the IRB hearing into charges against Ulrich and DeBellis was held. (*Id.* ¶ 97.) DeBellis was questioned for 40 minutes during the IRB hearing about whether he and Ulrich took bribes. (DeBellis PSAC ¶¶ 30, 63.) Ultimately, no charges were ever brought against Ulrich by the IRB, nor were any referred to prosecutorial agencies, and the matter was

closed.  (Ulrich PSAC ¶ 97; DeBellis PSAC ¶ 63.)  DeBellis further appealed his termination to the IBT and his appeal was rejected.  (DeBellis PSAC ¶ 64.)

After DeBellis was terminated, his health benefits were discontinued, and his vested pension fund benefits threatened.  (*Id.* ¶ 29.)  He did not receive timely notification of COBRA benefits and his retiree health benefits were improperly delayed after he was forced into retirement due to the loss of his position.  (*Id.*)  On March 10, 2016, DeBellis received a notification via certified mail from Local 812 that his family medical coverage was terminated effective February 29, 2016.  (*Id.* ¶ 65.)[13]  DeBellis called New York state employee benefits to make a complaint.  (*Id.*)  DeBellis's spouse conferenced Crossroads to ask why 11 days went by with no coverage prior to notification.  Crossroads said, "they were just informed by [L]ocal 812."  (*Id.*)  On March 15, 2016, DeBellis paid $1146.37 for COBRA Benefits to maintain coverage, but was still denied treatment at a doctor office for lack of coverage in March 2016.  (*Id.* ¶ 68.)

Meanwhile, on March 10, 2016, at the Union General Membership meeting Visconti told the membership that DeBellis had been taking kickbacks for three years.  (*Id.* ¶ 67.)  Moreover, in the minutes for the prior meeting on February 4, 2016, a meeting is reflected as having occurred between Vitta, Weber, and JC 16 President George L. Miranda ("Miranda"), but no details of such meeting were recorded as was custom and practice.  (*Id.*; Ulrich PSAC ¶ 99.)

On March 22, 2016, Weber sent a letter to the General Membership stating Ulrich was terminated for taking bribes and that they had referred the matter for criminal prosecution.

---

[13] On March 10, 2016, DeBellis also received a letter from Health Fund attorney Kane setting a March 23, 2016 deadline to return Local 812 property consisting of a cellphone and an iPad.  DeBellis alleges Kane was not Local 812's counsel and had no authority to make such direction.  (DeBellis PSAC ¶ 66.)  On March 23, 2016, DeBellis returned all Union property.  (*Id.* ¶ 70.)

(Ulrich PSAC ¶ 98; DeBellis PSAC ¶ 69.)  Ulrich alleged that neither Local 812, the Health

Fund, nor any attorney on their behalf communicated with state or federal prosecutors.  (Ulrich

PSAC ¶ 98.)

On March 29, 2016, a demand letter and a subsequent email were sent to Kane on behalf

of DeBellis seeking reinstatement.  (DeBellis PSAC ¶ 71.)

In or about March 2016, Surdi and Russo told Teamster member Ray Schwarz after a

Local 812 Scholarship meeting that Ulrich was going to be arrested that week by the FBI for

taking bribes from Crossroads and that the U.S. Attorney was involved.  (Ulrich PSAC ¶ 89.)

They repeated these comments to Schwarz at the Smithtown Coke Distribution Center.  (*Id*.)

On April 1, 2016, DeBellis's March COBRA check cleared.  (DeBellis PSAC ¶ 72.)  On

April 9, 2016, DeBellis was denied unemployment benefits, with "kickbacks" being cited as the

reason for the denial, allegedly "per the [D]efendants' communication which sought to contest

[DeBellis's] application."  (*Id*. ¶ 73.)

On April 22, 2016, JC 16 held a hearing regarding Local 812's February 1, 2016 charges

against Ulrich.  (Ulrich PSAC ¶ 99.)  JC 16 denied Ulrich an opportunity to present and cross

examine evidence and witnesses, or otherwise address the charges.  (*Id*.)  Acevedo participated

in this hearing and no disclosure about his potential conflict of interest was made.  Acevedo's

conflict of interest was known to JC 16 because Acevedo and Thompson were representing the

JC 16 President Miranda at the time.  (*Id*.)

On May 1, 2016, DeBellis was forced to retire due to his termination from his elected

Business Agent position.  (DeBellis PSAC ¶ 74.)  DeBellis alleges that during this period,

Defendants took action through discussion and written communication to union membership

stating that DeBellis had been terminated for taking bribes and that union members should not communicate with him.  (*Id*.)

On May 3, 2016, Raymond, as Counsel for IBT, engaged in ex parte communications with Local 812, Weber, Vitta and their counsel prior to the JC 16 "hearing" and Ulrich's appeal, without Ulrich's consent.  (Ulrich PSAC ¶ 100.)  On May 18, 2016, JC 16 rendered a decision against Ulrich.  (*Id*. ¶ 101.)  On May 31, 2016, Ulrich appealed this decision to the IBT.  Ulrich alleges that Raymond was responsible for the receipt, investigation, submissions and review of his appeal.  (*Id*. ¶ 102.)  Raymond continued to engage in ex parte communication with Local 812, Weber, Vitta and their counsel prior to and during the review of Ulrich's appeal to IBT.  (*Id*. ¶ 104.)

In July 2016, DeBellis was awarded unemployment benefits following a hearing and the union claims of bribe-taking were dismissed by written decision.  (DeBellis PSAC ¶ 73.)[14]  On July 1, 2016, DeBellis's retiree medical benefits were reinstated.  (*Id*. ¶ 75.)  On July 20, 2016, all COBRA payments were refunded to DeBellis.  (*Id*. ¶ 76.)

On September 29, 2016, Local 812 and Ulrich received a ruling from the New York State Unemployment Insurance Administration Law Judge dismissing Local 812's claims of misconduct by Ulrich and awarding unemployment benefits to Ulrich.  (Ulrich PSAC ¶ 103.) Local 812 failed to follow the ALJ's directions to submit documentation of subpoenas, proof of investigation, and referral to law enforcement, and consequently defaulted during the second day of the hearing.  (*Id*.)

---

[14] DeBellis does not provide details about the hearing that resulted in his receipt of unemployment benefits.

In November 2016, Surdi held a driver meeting at the Maspeth Coke Distribution Center and told Local 812 drivers that Ulrich was guilty of taking bribes, was being investigated by the U.S. Attorney and the FBI, and was going to be arrested. (Ulrich PSAC ¶ 91.)

On January 23, 2017, the IBT rendered a decision upon submission without any additional investigation, hearing, or review consistent with the IBT Constitution. (*Id*. ¶ 106.) Ulrich does not state what IBT's ultimate determination was.

On April 17, 2017, Ulrich received his Right to Sue letter from the EEOC and this action was commenced within 90 days thereof. (*Id*. ¶ 107)

Ulrich alleges, that at an unspecified point, a letter was sent to Local 812 members advising them that Ulrich was no longer a Teamster member and any communication or association with Ulrich would be a basis for themselves to be terminated from the Union. (*Id*. ¶ 110.) Ulrich alleges, that at an unspecified point following his complaints to the Pension Fund, Weber and Vitta told Pension Fund Board Members that Ulrich had taken bribes and that he was mentally unstable. (*Id*. ¶ 112.) Ulrich alleges that his engaging in the protected activity of reporting the Defendants' wrongdoing was the motivating factor in his wrongful termination on February 10, 2016. (*Id*. ¶ 48.)

Ulrich further alleges that the Pension Fund Defendants' failure to act upon his complaint and to timely investigate it and protect the Pension Fund resulted in a multi-million-dollar loss of value and affected the benefits Ulrich and other members would receive. (*Id*. ¶ 113.) DeBellis alleges that the shadow contract negotiated by Weber, Vitta, and Surdi, devalued the Pension Fund by $2.4 million, and that he, as a beneficiary of those funds, was personally damaged. (DeBellis PSAC ¶ 32.)

<u>7.  Plaintiffs' Claims</u>

Plaintiffs bring ten claims.  In Plaintiffs' PSACs, the language of Claims III, IV, V, VI, VIII, IX, and X remains mostly unchanged, but Claims I, II, and VII are substantially amended.

As amended, in Claim I, Plaintiffs allege a deprivation of due process in violation of Section 101(a) of the LMRDA against the Local 812 Defendants, JC 16 Defendants, and IBT Defendants, in connection with Plaintiffs' suspension/termination and other disciplinary actions taken against Plaintiffs.  (Ulrich PSAC ¶¶ 120–22; DeBellis PSAC ¶¶ 83–85.)

In Claim II, Plaintiffs allege a deprivation of due process and breach of contract in violation of Section 301 of the LMRA by IBT Defendants, in connection with IBT Defendants' alleged "rubber-stamping [of] the corrupt show proceedings of the Local 812," that led to Plaintiffs' suspension/termination.  (Ulrich PSAC ¶¶ 123–25; DeBellis PSAC ¶¶ 86–88.)[15]

In Claim III, Plaintiffs allege violations of their free speech rights by the Local 812 Defendants, JC 16 Defendants, and IBT Defendants, in violation of Title I of the LMRDA, 29 U.S.C. § 411, for Defendants' alleged retaliations against them for speaking out against Local 812 leadership and for DeBellis's association with Ulrich.  (Ulrich Am. Compl. ¶¶ 128–33; Ulrich PSAC ¶¶ 126–31; DeBellis Am. Compl. ¶¶ 91–96; DeBellis PSAC ¶¶ 89–94.)

In Claim IV, Plaintiffs allege a violation of their freedom of assembly, in violation of Title I of the LMRDA, 29 U.S.C. § 411, by the Local 812 Defendants, JC 16 Defendants, and

---

[15] In their Amended Complaints, Claims I and II alleged a breach of the duty of fair representation by the Local 812 Defendants, JC 16, and IBT Defendants, in violation of Section 8 of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b), and Section 301 of the LMRA, for Defendants' alleged actions against Plaintiffs, including terminating them from their union positions. (Ulrich Am. Compl. ¶¶ 122–27; DeBellis Am. Compl. ¶¶ 85–90.)  Plaintiffs deleted the NLRA claims from Claims I and II in the PSAC, added the LMRDA to Claim I, and removed JC 16 and Local 812 Defendants from Count II.  (Ulrich PSAC Blackline ¶¶ 120–25; DeBellis PSAC Blackline ¶¶ 83–88.)

IBT Defendants, for Defendants' actions in allegedly preventing Plaintiffs from attending Union meetings. (Ulrich Am. Compl. ¶¶ 134–37; Ulrich PSAC ¶¶ 132–35; DeBellis Am. Compl. ¶¶ 97–99; DeBellis PSAC ¶¶ 95–97.)

In Claim V, Plaintiffs allege retaliation by Local 812 Defendants, Health Fund Defendants, and Pension Fund Defendants, in violation of the whistleblower provision of Section 510 of ERISA, 29 U.S.C. § 1140. (Ulrich Am. Compl. ¶¶ 138–41; Ulrich PSAC ¶¶ 136–39; DeBellis Am. Compl. ¶¶ 100–03; DeBellis PSAC ¶¶ 98–101.)

In Claim VI, Plaintiffs allege retaliation by Health Fund and Pension Fund Defendants in violation of Section 510 of ERISA, in their capacity as "participants" and "beneficiaries." (Ulrich PSAC ¶¶ 140–43; DeBellis PSAC ¶¶ 102–105.)

In Claim VII, Plaintiffs allege a breach of fiduciary duty in violation of Section 404 of ERISA, 29 U.S.C. §§ 1104 and 1106, against the Health and Pension Fund Defendants, in connection with the allegedly corrupt payouts made by Defendants to the detriment of the Health and Pension Funds, and in connection with the allegedly improper removal of Plaintiffs as Trustees of the Health and Pension Funds. (Ulrich PSAC ¶¶ 144–47; DeBellis PSAC ¶¶ 106–09.)[16]

---

[16] In their Amended Complaints, Claim VI alleged retaliation by Health Fund Defendants in violation of Section 510 of ERISA in their capacity as "participants" in the Pension and Health plans. (Ulrich Am. Compl. ¶¶ 142–45; DeBellis Am. Compl. ¶¶ 104–07.) In Claim VII, Plaintiffs, in their capacity as "beneficiaries" of the Pension and Health plans, alleged retaliation by Health Fund Defendants in violation of Section 510 of ERISA. (Ulrich Am. Compl. ¶¶ 146–49; DeBellis Am. Compl. ¶¶ 108–11.) Ulrich named the Pension Fund Defendants as Defendants in those claims. (Ulrich Am. Compl. ¶¶ 142–49.)

Claim VI was amended to consolidate Claims VI and VII from the Amended Complaints so that Plaintiffs allege, in their capacity as "participants" and "beneficiaries," retaliation by Health Fund and Pension Fund Defendants in violation of Section 510 of ERISA. (Ulrich PSAC ¶¶ 140–43; DeBellis PSAC ¶¶ 106–109.) DeBellis also added the Pension Fund Defendants as Defendants to both Claims VI and VII. (DeBellis PSAC ¶¶ 102–109.)

In Claim VIII, Plaintiffs allege Local 812 Defendants violated Title VII, 42 U.S.C. § 2000e *et seq.* by retaliating against them for complaining about sexual harassment. (Ulrich Am. Compl. ¶¶ 150–53; Ulrich PSAC ¶¶ 148–51; DeBellis Am. Compl. ¶¶ 112–15; DeBellis PSAC ¶¶ 110–13.)

In Claim IX, Plaintiffs allege Local 812 Defendants violated New York State Human Rights Law § 296 by retaliating against them for complaining about sexual harassment. (Ulrich Am. Compl. ¶¶ 154–57; Ulrich PSAC ¶¶ 152–55; DeBellis Am. Compl. ¶¶ 116–19; DeBellis PSAC ¶¶ 114–17.)

In Claim X, Plaintiffs allege defamation by Weber, Vitta, and Surdi. (Ulrich Am. Compl. ¶¶ 158–65; Ulrich PSAC ¶¶ 156–63; DeBellis Am. Compl. ¶¶ 120–27; DeBellis PSAC ¶¶ 118–25.)

Claims VIII, IX, and X were not amended in the PSACs and Defendants do not move to dismiss these claims at this stage, nor do they discuss them in their briefing. (Local 812 Defs.' Mem. of Law in Opp'n to Ulrich's Mot. To Amend 1 ("Local 812 Defs.' Mem. re Ulrich") (Case No. 17-CV-4730, Dkt. No. 58); Local 812 Defs.' Mem. of Law in Opp'n to DeBellis's Mot. To Amend 1 ("Local 812 Defs.' Mem. re DeBellis") (Case No. 17-CV-5547, Dkt. No. 50).) Therefore, the Court only considers Claims I through VII in deciding the pending Motions.

---

Claim VII was amended to newly allege a breach of fiduciary duty in violation of Section 404 of ERISA, 29 U.S.C. §§ 1104 and 1106. (Ulrich PSAC ¶¶ 144–47; DeBellis PSAC ¶¶ 106–09.) The breach of fiduciary duty claim was not alleged in the Amended Complaints and is new in the PSACs.

B.  Procedural Background

1.  Ulrich's Case

Ulrich filed his Complaint on June 22, 2017.  (Case No. 17-CV-4730, Compl. (Dkt. No.

1).)  On June 27, 2017, Ulrich filed a Statement of Relatedness, explaining how his case is

related to Case No. 17-CV-137, in which Local 812 is suing Ulrich. (*See* Case No. 17-CV-4730,

Dkt. No. 6; Case No. 17-CV-137, Dkt. No. 1.)  On June 6, 2017, the Court stayed discovery and

suspended the case management and motion schedules in Case No. 17-CV-137 pending a

conference to discuss how to manage the related cases and the issuance of a new case

management schedule covering both cases.  (*See* Case No. 17-CV-4730, Dkt. No. 7; Case No.

17-CV-137, Dkt. No. 56.)

On July 13, 2017, the Court held a status conference and instructed the Parties to file a

stipulation as to how the related cases would be managed.  (*See* Case No. 17-CV-4730, Dkt.

(minute entry for July 13, 2017).)  On July 24, 2017, the Parties agreed by stipulation that Ulrich

would dismiss all counterclaims and his third-party complaint against all Defendants named

therein in Case No. 17-CV-4730, and that the parties would treat the actions as joined for

purposes of discovery and trial.  (Case No. 17-CV-4730, Dkt. No. 8.)  On August 2, 2017, the

Parties further agreed by stipulation on how Defendants were to be served.  (Case No. 17-CV-

4730, Dkt. No. 9.)  On August 24, 2017, the Parties agreed by stipulation to extend Defendants'

time to answer, move, or otherwise plead to Ulrich's Complaint.  (Case No. 17-CV-4730, Dkt.

No. 19.)

On September 6, 2017, counsel for the Pension Fund Defendants submitted a pre-motion

letter to the Court requesting permission to file a Motion to Dismiss Ulrich's Complaint.  (*See*

Letter from Scott A. Gold, Esq., to Court (Case No. 17-CV-4730, Dkt. No. 20).)  On September

7, 2017, counsel for the Local 812 Defendants submitted a pre-motion letter to the Court requesting permission to file a Motion to Dismiss Ulrich's Complaint. (*See* Letter from Larry Carry, Esq., to Court (Case No. 17-CV-4730, Dkt. No. 23).) On September 12, 2017, counsel for the IBT Defendants submitted a pre-motion letter to the Court requesting permission to file a Motion to Dismiss Ulrich's Complaint. (*See* Letter from Richard M. Seltzer, Esq., to Court (Case No. 17-CV-4730, Dkt. No. 24).)

### 2. DeBellis's Case

DeBellis filed his Complaint on July 21, 2017. (Case No. 17-CV-5547, Compl. (Dkt. No. 4).) On August 28, 2017, DeBellis and IBT Defendants agreed by stipulation to extend IBT Defendants' time to answer, move, or otherwise plead to DeBellis's Complaint. (Case No. 17-CV-5547, Dkt. No. 12.) On August 29, 2017, DeBellis filed a Statement of Relatedness, explaining that his case, Case No. 17-CV-5547, is related to Ulrich's case, Case No. 17-CV-4730, because they involve substantially the same parties, facts, and legal issues. (*See* Case No. 17-CV-5547, Dkt. No. 13.)

### 3. Treatment as Related Cases

On September 12, 2017, counsel for Plaintiffs submitted a letter to the Court requesting an adjournment of a scheduled conference and an extension to respond to Defendants' pre-motion letters. (*See* Letter from Joseph Ranni, Esq., to Court (Case No. 17-CV-4730, Dkt. No. 25; Case No. 17-CV-5547, Dkt. No. 14.) On September 13, 2017, the Court granted Plaintiffs' extension requests. (Case No. 17-CV-4730, Dkt. No. 26; Case No. 17-CV-5547, Dkt. No. 15.)

On October 19, 2017, the Court held a pre-motion conference and instructed Plaintiffs to amend their Complaints. (*See* Case Nos. 17-CV-4730 and 17-CV-5547, Dkt. (minute entry for Oct. 19, 2017).) On November 9, 2017, Plaintiffs filed their Amended Complaints. (*See* Ulrich

Am. Compl.; DeBellis Am. Compl.)  Thereafter, on January 22, 2018, all Defendants filed motions to dismiss.  (*See* Case No. 17-CV-4730, Dkt. Nos. 35–44; Case No. 17-CV-5547, Dkt. Nos. 27–36.)

On February 15, 2018, new co-counsel entered appearances on behalf of Plaintiffs.  (*See* Case Nos. 17-CV-4730, Dkt. Nos. 45–46; Case No. 17-CV-5547, Dkt. No. 37–38.)  On February 21, 2018, the Court granted Plaintiffs' extension requests to oppose Defendants' motions.  (*See* Case No. 17-CV-4730, Dkt. No. 48; Case No. 17-CV-5547, Dkt. No. 40.)  On March 7, 2018, new co-counsel for Plaintiffs submitted a pre-motion letter to the Court requesting permission to file a motion to amend and noting that Defendants refused to consent to the filing of Second Amended Complaints.  (*See* Letter from Joseph Ranni, Esq., to Court (Case No. 17-CV-4730, Dkt. No. 49; Case No. 17-CV-5547, Dkt. No. 41).)  On March 8, 2018, the Court granted Plaintiffs' request to file motions to amend and set a new briefing schedule.  (Case No. 17-CV-4730, Dkt. No. 50; Case No. 17-CV-5547, Dkt. No. 42).)  On March 13, 2018, the Court denied Defendants' motions to dismiss without prejudice given that Plaintiffs were granted leave to file motions to amend.  (Case No. 17-CV-4730, Dkt. No. 51; Case No. 17-CV-5547, Dkt. No. 43).)

On April 13, 2018, Plaintiffs filed their Motions to Amend and accompanying papers.  (*See* Ulrich Not. of Mot.; Aff. of Ran Mukherjee, Esq. ("Mukherjee Aff. re Ulrich") (Case No. 17-CV-4730, Dkt. No. 54); Ulrich's Mem. of Law in Supp. of Mot. To Amend ("Ulrich's Mem.") (Case No. 17-CV-4730, Dkt. No. 55); DeBellis Not. of Mot.; Decl. of Ran Mukherjee, Esq. ("Mukherjee Decl. re DeBellis") (Case No. 17-CV-5547, Dkt. No. 46); DeBellis's Mem. of Law in Supp. of Mot. To Amend ("DeBellis's Mem.") (Case No. 17-CV-5547, Dkt. No. 47).)

On May 1, 2018, Pension Fund Defendants filed their Opposition to Plaintiffs' Motions. (Pension Fund Defs.' Mem. of Law in Opp'n to Ulrich's Mot. To Amend ("Pension Fund Defs.'

Mem. re Ulrich") (Case No. 17-CV-4730, Dkt. No. 56); Pension Fund Defs.' Mem. of Law in

Opp'n to DeBellis's Mot. To Amend ("Pension Fund Defs.' Mem. re DeBellis") (Case No. 17-

CV-5547, Dkt. No. 48).)  IBT Defendants filed their Opposition to Plaintiffs' Motions to Amend

that same day.  (IBT Defs.' Mem. of Law in Opp'n to Ulrich's Mot. To Amend ("IBT Defs.'

Mem. re Ulrich") (Case No. 17-CV-4730, Dkt. No. 57); IBT Defs.' Mem. of Law in Opp'n to

DeBellis's Mot. To Amend ("IBT Defs.' Mem. re DeBellis") (Case No. 17-CV-5547, Dkt. No.

49).)  Local 812 Defendants also filed their opposition and supporting documents on May 1,

2018.  (Local 812 Defs.' Mem. re Ulrich; Decl. of Larry Cary, Esq. ("Cary Decl. re Ulrich")

(Case No. 17-CV-4730, Dkt. No. 59); Local 812 Defs.' Mem. re DeBellis; Decl. of Larry Carry,

Esq. ("Carry Decl. re DeBellis") (Case No. 17-CV-5547, Dkt. No. 51).)

On May 15, 2018, Plaintiffs filed their Reply Memoranda in Further Support of their

Motions to Amend.  (*See* Ulrich's Mem. of Law in Further Supp. of Mot. to Amend in Reply to

Local 812 Defs.' Opp'n ("Ulrich's Reply re Local 812 Defs.") (Case No. 17-CV-4730, Dkt. No.

60); Ulrich's Mem. of Law in Further Supp. of Mot. to Amend in Reply to IBT Defs.' Opp'n

("Ulrich's Reply re IBT Defs.") (Case No. 17-CV-4730, Dkt. No. 61); Ulrich's Mem. of Law in

Further Supp. of Mot. to Amend in Reply to Pension Fund Defs.' Opp'n ("Ulrich's Reply re

Pension Fund Defs.") (Case No. 17-CV-4730, Dkt. No. 62); DeBellis's Mem. of Law in Further

Supp. of Mot. to Amend in Reply to Local 812 Defs.' Opp'n ("DeBellis's Reply re Local 812

Defs.") (Case No. 17-CV-5547, Dkt. No. 52); DeBellis's Mem. of Law in Further Supp. of Mot.

to Amend in Reply to IBT Defs.' Opp'n ("DeBellis's Reply re IBT Defs.") (Case No. 17-CV-

5547, Dkt. No. 53); DeBellis's Mem. of Law in Further Supp. of Mot. to Amend in Reply to

Pension Fund Defs.' Opp'n ("DeBellis's Reply re Pension Fund Defs.") (Case No. 17-CV-5547,

Dkt. No. 54).)

## II. Discussion

### A. Standard of Review

Federal Rule of Civil Procedure 15 supplies the legal standard applicable to a motion to amend a complaint. Rule 15(a)(2) provides that leave to amend a complaint shall be "freely" given when "justice so requires." Fed. R. Civ. P. 15(a)(2). However, "[i]t is within the sound discretion of the district court to grant or deny leave to amend." *Barbata v. Latamie*, No. 11-CV-7381, 2012 WL 1986981, at *2 (S.D.N.Y. June 4, 2012) (quoting *Green v. Mattingly*, 585 F.3d 97, 104 (2d Cir. 2009)). "A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008) (per curiam) (noting that a court should deny leave to amend "in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party" (citing *Foman*, 371 U.S. at 182)). However, "[o]utright refusal to grant the leave without any justifying reason for the denial is an abuse of discretion." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) (citing *Foman*, 371 U.S. at 182).

#### 1. Futility

"To determine whether a proposed pleading is futile, courts analyze whether it would withstand a motion to dismiss." *Agerbrink v. Model Service LLC*, 155 F. Supp. 3d 448, 456 (S.D.N.Y. 2016) (citation omitted); *see also AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726 (2d Cir. 2010) ("Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of

fact." (citation omitted)). "The opposing party must establish that granting leave to amend would be futile." *Blagman v. Apple, Inc*., No. 14-CV-5453, 2014 WL 2106489, at *5 (S.D.N.Y. May 19, 2014) (citation omitted); *Sotheby's, Inc. v. Minor*, No. 08-CV-7694, 2009 WL 3444887, at *3 (S.D.N.Y. Oct. 26, 2009) (same).

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R.

Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . . " (internal quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citation omitted).

Generally, "[i]n adjudicating a [motion to dismiss], a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). "To go beyond the allegations in the [c]omplaint would convert the . . . motion to dismiss into one for summary judgment . . . ." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).

## 2.  Prejudice, Delay, and Bad Faith

If a party challenges a proposed amendment on the ground of prejudice, a court must evaluate whether the amendment would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Agerbrink*, 155 F. Supp. 3d at 454 (quoting *Monahan v. N.Y.C. Dep't of Corrs.*, 214 F.3d 275,

284 (2d Cir. 2000) (quotation marks omitted). Courts also consider the procedural posture of the case. *See, e.g.*, *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) ("Undue prejudice arises when an 'amendment comes on the eve of trial and would result in new problems of proof.'" (citation and alteration omitted)); *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (upholding denial of leave to amend sought after discovery had closed and while summary judgment motion was pending). Although "[p]rejudice to the opposing party . . . has been described as the most important reason for denying a motion to amend," *Frenkel v. N.Y.C. Off–Track Betting Corp.*, 611 F. Supp. 2d 391, 394 (S.D.N.Y. 2009) (citation omitted), *adopted by* 701 F. Supp. 2d 544 (S.D.N.Y. 2010), only undue prejudice warrants denial of leave to amend, *see A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000). The opposing party bears the burden "of demonstrating that substantial prejudice would result were the proposed amendment to be granted." *Agerbrink*, 155 F. Supp. 3d at 454 (citation omitted).

As to delay, in the Second Circuit, "[m]ere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (citations omitted); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000) ("[W]e have held repeatedly that 'mere delay' is not, of itself, sufficient to justify denial of a Rule 15(a) motion . . . ." (citation omitted)). Where a significant period of time has passed prior to filing a motion to amend, however, the moving party must provide an explanation for the delay. *See Park B. Smith, Inc. v. CHF Industries Inc*., 811 F. Supp. 2d 766, 779 (S.D.N.Y. 2011) (describing burden to explain extended delay and collecting cases); *see also Margel v. E.G.L. Gem Lab Ltd*., No. 04-CV-1514, 2010 WL 445192, at *11 (S.D.N.Y. Feb. 8, 2010) ("[T]he court may deny leave to

amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice other parties." (emphasis and quotation marks omitted) (citing *Grace v. Rosenstock*, 228 F.3d 40, 53–54 (2d Cir. 2000)).  However, courts have allowed amendment despite long intervals between the discovery of certain facts and the filing of an amended pleading.  *See, e.g., Valentini v. Citigroup, Inc*., No. 11-CV-1355, 2013 WL 4407065, at *7 (S.D.N.Y. Aug. 16, 2013) (finding delay of eighteen months "insufficient ground to warrant denial of [a] motion to amend" where non-moving party "failed to establish bad faith or undue prejudice"); *Duling v. Gristede's Operating Corp*., 265 F.R.D. 91, 98 (S.D.N.Y. 2010) (allowing amendment two and one-half years after case began and noting that "even vague or 'thin' reasons [for delay] are sufficient, in the absence of prejudice or bad faith" (citation omitted)).

"[W]hen the opponent of an amendment asserts that the movant is acting in bad faith, there must be something more than mere delay or inadvertence for the court to refuse to allow amendment."  *Primetime 24 Joint Venture v. DirecTV*, Inc., No. 99-CV-3307, 2000 WL 426396, at *5 (S.D.N.Y. April 20, 2000); *see also Blagman*, 2014 WL 2106489, at *3 ("To the extent that the defendants claim that [the plaintiff's] delay was strategic, they provide no showing of bad faith apart from the delay itself."); *Randolph Found. v. Duncan*, No. 00-CV-6445, 2002 WL 32862, at *3 (S.D.N.Y. Jan. 11, 2002) ("[T]he fact that a party may have had evidence to support a proposed amendment earlier in the litigation does not, by itself, give rise to an inference of bad faith.").

1.  LMRDA Section 101(a)(5) Due Process Claims

Plaintiffs allege that the suspension/termination of Ulrich as Vice President of Local 812 and as Trustee of the Pension and Health Funds, and DeBellis's suspension/termination as Business Agent of Local 812 and as Trustee of the Health Fund, violated their respective due process rights under Section 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5).  Section 101(a)(5) provides that,

> No *member* of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5) (emphasis added).  Defendants argue that Plaintiffs cannot plausibly plead a Section 101(a)(5) claim because these procedural safeguards protect the membership rights of union members, not union officers or employees from removal from office.  (IBT Defs.' Mem. re Ulrich 4, 9–11; Local 812 Defs.' Mem. re Ulrich 14–17; IBT Defs.' Mem. re DeBellis 8–10; Local 812 Defs.' Mem. Re DeBellis 14–16.)

The caselaw overwhelmingly supports Defendants' view, as courts have held that "[i]t is well-settled that Section 101(a)(5) only protects union members against a loss of membership rights due to being unfairly disciplined by a union.  It does not protect union members in their official capacities (as elected or appointed officials) from losing rights related to their official position."  *Green v. Brigham*, No. 03-CV-5190, 2005 WL 280327, at *4 (E.D.N.Y. Feb. 3, 2005) (citation omitted); *see also United States v. Int'l Bhd. Teamsters*, 156 F.3d 354, 361 (2d Cir. 1998) (dismissing Section 101(a)(5) claims brought by union president-business manager and union secretary-treasurer who were removed from office following hearings regarding their

alleged misappropriation of union funds because "a claimant under [Section 101(a)(5)] cannot assert a cause of action for his removal from office as that would affect only his rights as an official—not his membership rights" (citing *Finnegan v. Leu*, 456 U.S. 431, 438 (1982)); *Murray v. Carroll*, No. 06-CV-1650, 2007 WL 1732589, at *2 (D. Conn. June 12, 2007) (holding that "the provisions of Section[] 101(a)(5) . . . apply to disciplinary sanctions taken against members as members rather than the removal of elected officers" (citation omitted)); *Messina v. Local 1199 SEIU*, 205 F. Supp. 2d 111, 124-27 (S.D.N.Y. 2002) (dismissing Section 101(a)(5) claim in case where union organizer and delegate was removed from office following conflict with union leadership, because Section 101(a)(5)'s procedural protections do not extend to removal from union office (citing *Finnegan*, 456 U.S. at 437–38 & n. 8)); *Depperman v. Local 1199 Union*, No. 91-CV-6696, 1993 WL 36132, *4 (S.D.N.Y. Feb. 10, 1993) (dismissing Section 101(a)(5) claim brought by a plaintiff who was removed as a delegate from the union because "Section 101(a)(5) provides safeguards to members subjected to discipline, not delegates or agents [of the union]" (citing *Finnegan*, 456 U.S. at 438)); *Helmer v. Briody*, 759 F. Supp. 170, 178-79 (S.D.N.Y. 1991) (dismissing Section 101(a)(5) claim brought by a former union business manager because Section 101(a)(5) "applies only to suspension of membership in the union; it does not refer to suspension of a member's status as an officer of the union." (emphasis omitted) (quoting *Finnegan*, 456 U.S. at 438)).  *Cf. Franza v. Int'l Bhd. of Teamsters, Local 671*, 869 F.2d 41, 48 (2d Cir. 1989) (holding that termination of union employee did not violate LMRDA where individual's membership rights were unaffected by his loss of employment); *Schonfeld v. Penza*, 477 F.2d 899, 904 (2d Cir. 1973) ("Title I of the [LMRDA] protects the union-member relationship, but not the union official or the union-employee relationship, and . . . removal from

union office gives rise to no rights in the removed official as an official under the Act." (emphasis omitted)).[17]

Plaintiffs argue that their PSACs clearly allege "the procedural shortcomings at issue" in the negative employment actions allegedly taken against them by Local 812 and ratified by JC 16 and IBT. (Ulrich's Reply re Local 812 Defs. 7; DeBellis Reply re Local 812 Defs. 6; Ulrich's Reply re IBT Defs. 6; DeBellis's Reply re IBT Defs. 4.) These procedural shortcomings include, among others, Raymond's ex parte communications with Defendants prior to the JC 16 hearing

---

[17] As the Supreme Court has noted, the legislative history of Section 101(a)(5) is also consistent with Defendants' view. The Conference Report accompanying the LMRDA as enacted explains that Section 101(a)(5)'s "prohibition on suspension without observing certain safeguards applies only to suspension of membership in the union; it does not refer to suspension of a member's status as an officer of the union." *Finnegan v. Leu*, 456 U.S. 431, 438 (1982) (citation, emphasis, and quotation marks omitted) (holding that union's termination of an appointed business agent was not actionable under Section 101(a)(5)). *Finnegan* is not dispositive because the Supreme Court was interpreting a different provision of the LMRDA, but in so doing discussed its legislative history as it relates to the provision at issue here.

Plaintiffs point to *Sheet Metal Workers' Int'l Ass'n v. Lynn*, 488 U.S. 347 (1989) to distinguish *Finnegan*. (Ulrich's Reply re IBT Defs. 6; Ulrich's Reply re Local 812 Defs. 6.) In *Lynn*, however, the Supreme Court concluded that the removal of a union's elected business agent in retaliation for statements made at a union meeting in opposition to dues increases violated the free speech provision of Title I of the LMRDA, Section 101(a)(2). 488 U.S. at 358. *Lynn* concerned free speech rights under Section 101(a)(2) and is not determinative of the question at issue here—whether Section 101(a)(5)'s due process protections apply to the removal of union officers from their positions. *Lynn* also said nothing about overruling or limiting *Finnegan*. Indeed, Justice White also expressly noted in his concurrence that the reason the claim in *Lynn* survived even in the wake of *Finnegan*, was that there, the plaintiff spoke as a union member and not as an officer. 488 U.S. at 360 (White J., concurring).

Plaintiffs also cite *Grant v. Commc'ns Workers of Am., Local 1101*, No. 16-CV-9533, 2017 WL 6000605 (S.D.N.Y. Dec. 1, 2017), in which the court concluded that allegations that a plaintiff was suspended from his position as a business agent on the local union executive board with ill intent, and that there was an absence of due process, were sufficient to state a claim under § 101(a)(5). *Id.* at *6. (Ulrich's Reply re Local 812 Defs. 6; DeBellis Reply re Local 812 Defs. 6.) However, unlike the Supreme Court in *Finnegan*, 456 U.S. 431, and unlike the courts in the Second Circuit that have held that § 101(a)(5)'s procedural protections do not extend to the removal from office, *see, e.g.*, *Messina*, 205 F. Supp. 2d at 124-27, the court in *Grant* did not consider the threshold question whether § 101(a)(5)'s procedural protections applied to a business agent, namely a union officer, in the first place. Indeed, the court does not discuss *Finnegan*.

as well as before Ulrich's appeal, (Ulrich PSAC ¶ 26), the April 22, 2016 JC 16 hearing at which

Plaintiffs were not allowed to present or cross examine evidence or witnesses, the fact that

Acevedo, who had conflicts of interest, presided over that hearing, (*id.* ¶ 99), the IBT's January

23, 2017 decision which was rendered without any additional investigation, hearing, or review,

(*id.* ¶ 105), and JC 16 and IBT's refusal to hear DeBellis's appeal, (DeBellis PSAC ¶ 74).

Plaintiffs also allege that Defendants refused to advise them of whether any charges had been

filed or to specify what the allegations against them were, (Ulrich PSAC ¶¶ 59, 80), and failed to

provide them with notice of the interrogation held at the Executive Board meeting, or an

opportunity to review any evidence, (*id.* ¶¶ 82-87).[18]

---

[18] Inasmuch as Plaintiffs argue that they properly allege in their PSACs that their union membership rights were interfered with because they were prevented from attending union membership meetings, this argument fails. (*See* Ulrich's Reply re Local 812 Defs. 7; DeBellis Reply re Local 812 Defs. 6.) DeBellis alleges he was "prevent[ed] from attending meetings *amongst Board Members* where union business was discussed, and decisions made." (DeBellis PSAC ¶ 96 (emphasis added).) Thus, DeBellis only alleges he was prevented from attending Board meetings—he does not allege he was prevented from attending General Membership meetings. And in his Memorandum, he states that he retired as a union member, (DeBellis Reply re Local 812 Defs. 6), not that he was expelled. Thus, DeBellis does not allege interference with his membership right of attending union meetings.

Ulrich alleges that he was "locked out of the offices of Local 812 . . . [and] barred from meetings and interaction with the membership." (Ulrich PSAC ¶ 70). But he fails to allege whether having access to the offices was a function of his Board position or of his membership. It is not at all clear that union members have unfettered access to union offices. Ulrich also fails to offer any "further factual enhancement[s]," *Iqbal*, 556 U.S. at 678 (citation omitted), regarding who kept him out of general union membership meetings and how this was done. He does not specify any dates or times of meetings that he attempted to attend and was kept out of, nor does he allege that he ever received any kind of notification or warning not to attend membership meetings. Ulrich's naked allegation that he was prevented from attending meetings with the membership does not state a plausible claim. *See Laity v. Beatty*, 766 F. Supp. 92, 103 (W.D.N.Y. 1991) (dismissing LMRDA claim where plaintiff's removal from his position as union steward did not impair his right to free expression because the plaintiff failed to adequately allege that he did not remain free to express his views at membership meetings), *aff'd sub nom. N.L.R.B. v. MMIC Inc.*, 956 F.2d 1160 (2d Cir. 1992); *Franza v. Int'l Bhd. of Teamsters, Local 671*, 680 F. Supp. 496, 503–04 (D. Conn. 1988) (dismissing LMRDA claim where the plaintiff failed to adequately allege that "he was prohibited from participating in union affairs or that he was the target of a plan to stifle dissent"), *aff'd* 869 F.2d 41 (2d Cir. 1989).

Defendants correctly point out that Plaintiffs do not allege the infringement of any membership rights for having been terminated from their employment with the Union and from their positions as Trustees. (Local 812 Defs.' Mem. re Ulrich 16; Local 812 Defs.' Mem. Re DeBellis 16.) The procedural shortcomings Plaintiffs point to allegedly occurred in the hearings that led to their termination as Vice President and Business Agent, and as Trustees, but Plaintiffs do not allege that these procedurally deficient hearings also led to their termination as union members. Nowhere in the PSACs, or any version of the Complaints, do Plaintiffs allege whether, when, and why their union membership came to an end. The Parties for the first time in their briefing mention that JC 16 suspended Ulrich from membership for a ten-week period, (Local 812 Defs.' Mem. re Ulrich 16), that DeBellis retired as a union member, (DeBellis Reply re Local 812 Defs. 6), and that Plaintiffs were ultimately removed from union membership, (Ulrich's Reply re Local 812 Defs. 6–7; Ulrich's Reply re IBT Defs. 6; DeBellis's Reply re IBT Defs. 4–5). However, Plaintiffs do not cite to the portions of their PSACs where they allege that their union membership was terminated—and indeed, they cannot, because they make no such allegations.[19] Accordingly, the procedural violations they allege are related to the "suspension of [their] status as an officer of the union," *Finnegan*, 456 U.S. at 438. And Plaintiffs cannot state a claim under Section 101(a)(5) for the procedural deficiencies that led to their removal as Vice President and Business Agent, and as Trustees because "Section 101(a)(5) only protects union

_____

[19] Even if the Court were to consider the allegations mentioned for the first time in the Parties' briefs that Ulrich was suspended from membership for ten weeks and was ultimately removed, no allegations have been made about how the suspension and removal came about, whether separate hearings were held that led to the suspension and removal and whether they were also procedurally deficient, and what curtailment of membership rights, if any, they ultimately resulted in.

members against a loss of membership rights due to being unfairly disciplined by a union. It does not protect union members in their official capacities." *Green*, 2005 WL 280327, at *4.

Accordingly, Plaintiffs PSACs do not state Section 101(a)(5) due process claims as to Local 812 Defendants, IBT Defendants, and JC 16 Defendants, and the proposed amendments are futile with respect to these claims.

### 2. LMRA Section 301 Due Process and Breach of Contract Claims

Plaintiffs allege that IBT and Raymond violated Section 301 of the LMRA by denying them due process in violation of the IBT Constitution in "rubber stamping the corrupt show proceedings of the Local 812" such that "the decisions of the Local 812 with respect to Plaintiff[s]" being "suspended, terminated, and/or otherwise disciplined were improperly ratified and affirmed." (Ulrich PSAC ¶¶ 123–25; DeBellis PSAC ¶¶ 86–88.)

Defendants argue that Plaintiffs' LMRA claims fail because, among other things, Ulrich's PSAC fails to allege that IBT or Raymond were involved in any discipline Ulrich was subjected to or that they conducted any review of Ulrich's suspension/termination by Local 812, (IBT Defs.' Mem. re Ulrich 11–12), that DeBellis's PSAC fails to allege any specific action by IBT or Raymond that denied him due process, and that Plaintiffs fail to point to the provisions of the IBT Constitution that address a local union officer's suspension/termination, (IBT Defs.' Mem. re DeBellis 11). Defendants also argue that individual union agents like Raymond are immune from monetary liability under Section 301. (IBT Defs.' Mem. re Ulrich 12; IBT Defs.' Mem. re DeBellis 11–12).[20]

---

[20] Plaintiffs did not present any new or separate arguments regarding the viability of their Section 301 LMRA claims, and cited no caselaw addressing Section 301 claims, but instead relied on the same arguments they made in their memoranda regarding their LMRDA due process claims. (Ulrich's Reply re IBT Defs. 4–6; DeBellis's Reply re IBT Defs. 3–5.)

Section 301 of the LMRA provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties . . . ." 29 U.S.C. § 185(a). "Union constitutions are considered contracts within the meaning of [Section] 301 and individual union members may bring suit under [Section] 301 for violation of a union constitution." *Farrell v. Hellen*, 367 F. Supp. 2d 491, 505 (S.D.N.Y. 2005) (citation and quotation marks omitted)); *see also Woodell v. Int'l Bhd. of Elec. Workers, Local 71*, 502 U.S. 93, 101–02 (1991) (holding that union members may bring suits based on union constitutions under Section 301); *Shea v. McCarthy*, 953 F.2d 29, 31–32 (2d Cir. 1992) (same).

"Individual union officials are not subject to claims for damages under § 301 . . . [but] may be subject to equitable relief in their official capacities." *Farrell*, 367 F. Supp. 2d at 505 (citations omitted); *see also Kazolias v. IBEW LU 363*, No. 09-CV-7222, 2012 WL 6641533, at *22 (S.D.N.Y. Dec. 11, 2012) (noting "that individual union officers may be held liable for breaches of an internal union constitution, but only for equitable relief" (citing *Shea*, 953 F.2d at 32 (upholding individual liability under the LMRA as to equitable relief, not money damages)), *adopted in part by* 2013 WL 3682926 (S.D.N.Y. July 1, 2013), *aff'd in part, vacated in part, remanded sub nom.*, 806 F.3d 45 (2d Cir. 2015); Section 301(b), 29 U.S.C. § 185(b) ("Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.").

Plaintiffs allege that on March 3, 2016, the IRB held a hearing regarding the charges against Ulrich and DeBellis. (Ulrich PSAC ¶ 97.) DeBellis alleges he was questioned for 40 minutes during the IRB hearing about whether he and Ulrich took bribes. (DeBellis PSAC

¶¶ 30, 63.)  Ultimately, no charges were ever brought against Ulrich by the IRB, nor were any

referred to prosecutorial agencies, and the matter was closed.  (Ulrich PSAC ¶ 97; DeBellis

PSAC ¶ 63.)  However, Ulrich does not allege attending or being kept out of this hearing, he

does not allege any procedural shortcomings occurred in this hearing—he in fact offers no

information whatsoever about this hearing.  Separately, on April 22, 2016, JC 16 held a hearing

related to Local 812's charges of misconduct against Ulrich.  (Ulrich PSAC ¶ 99.)  After JC 16

rendered a decision against him with respect to the charges against him, (*id*. ¶ 101), Ulrich

appealed JC 16's decision to the IBT on May 31, 2016, (*id*. ¶ 102).  Ulrich alleges that Raymond

was responsible for the receipt, investigation, submission, and review of his appeal.  (*Id*.)  Ulrich

does not, however, allege that Raymond did anything improper with his appeal or somehow

prevented it from being filed and reviewed by the IBT.  Ulrich further alleges that "[o]n January

23, 2017, the IBT rendered a decision upon submission without any additional investigation,

hearing, or review consistent with the IBT Constitution."  (*Id*. ¶ 105 (emphasis added).)

Raymond, as Counsel for IBT, allegedly engaged in ex parte communications with Local 812,

Weber, Vitta and their counsel prior to the April 22, 2016 JC 16 hearing, and his IBT appeal,

without Ulrich's consent, (*id*. ¶¶ 100, 104), but Plaintiffs offer no details about these

communications.  Separately, Ulrich appealed his termination to JC 16 on February 16, 2016,

(*id*. ¶ 92), and JC 16 declined to review for lack of jurisdiction, (*id*).  Ulrich does not allege that

he took any further steps to appeal his termination after JC 16 declined to review.

Ulrich's claim fails for several reasons, starting with his failure to offer any facts about

the IBT Constitution on which he bases his Section 301(a) claim against IBT and Raymond.  For

example, Ulrich does not allege which provision of the IBT Constitution was violated, not even

summarily.  He also fails to allege that the IBT Constitution even has a provision that governs

the review of a local union officer's suspension/termination or disciplinary hearings. The Court notes that with respect to his termination, Ulrich alleges that *Local 812 By-laws* required "specific due process procedures requiring notice; allegations of wrongdoing; written charges, and Board approval to retain an investigator, attorneys or accountants, [and that] none of these procedural requirements were met." (*Id.* ¶ 58.) However, Ulrich bases his LMRA § 301 claim against IBT Defendants on violations of the *IBT Constitution*, not on violations *of Local 812 By-laws*, so his citation to Local 812 By-laws is inapposite. Indeed, Ulrich could not base a § 301 claim on the Local 812 By-laws because, "[w]hile violations of an international union's constitution . . . are actionable, violations of a local union's constitution . . . are not." *Green*, 2005 WL 280327, at *11; *see also Dinuzzo v. Local 79, Laborers Int'l Union*, No. 03-CV-4112, 2003 WL 21378596, at *2–3 (S.D.N.Y. June 16, 2003) (same); *Messina*, 205 F. Supp. 2d at 126 (same).

Even if Ulrich had alleged any facts about the IBT Constitution, the only facts he alleges about IBT and Raymond's conduct and involvement are not related to his termination at all. The JC 16 is the only entity Ulrich asked to review his termination, and it expressly found that it did not have jurisdiction to review Local 812's termination. (Ulrich PSAC ¶ 92.) Ulrich fails to allege IBT had any authority to review JC 16 or Local 812 decisions with respect to his termination, or that he even appealed his termination to IBT. The March 23, 2016 IBT hearing, and the January 23, 2017 IBT appeal decision both in fact related to charges of bribery against Ulrich and DeBellis, not to the process or procedures by which they were terminated. (*Id.* ¶¶ 99, 101, 105.) Ulrich does not allege any procedural deficiencies in the March 23 IBT hearing and fails to allege any facts about why the IBT denied his appeal. He alleges that Raymond was in charge of receiving and processing his appeal papers, (*id.* ¶ 102), but alleges no facts about any

wrongdoing on Raymond's part with respect to his performance of those duties. And inasmuch as Ulrich alleges that the IBT hearing and the IBT appeal denial were "other[] discipline[]," he fails to allege what harm or damage resulted given that no charges were ultimately brought against him. (*Id.* ¶ 97; DeBellis PSAC ¶ 63.)

DeBellis's claim faces a similar fate. DeBellis alleges that JC 16 declined to review his request for reinstatement because it alleged that it had no authority to review the Local 812 termination decision. (DeBellis PSAC ¶ 57.) DeBellis alleges IBT subsequently rejected his appeal of that decision and that he was thus "denied his due process rights as provided by the IBT Constitution and relevant By-Laws." (*Id.* ¶ 64.) However, DeBellis fails to offer any facts about IBT's denial—he does not, for example, state why IBT declined to review Local 812's termination. Like Ulrich, DeBellis fails to offer any facts about which provisions of the IBT Constitution were allegedly violated. Plaintiffs have made no allegations about what kind of appellate procedure the IBT Constitution would have required. Plaintiffs in essence ask the Court to decide a breach of contract claim without any reference whatsoever to the provisions of the contract.

Plaintiffs do not cite to any LMRA Section 301 caselaw, and the Court is not aware of any such caselaw, in which a Section 301(a) claim for the termination of union officials without due process in violation of a union constitution survives where the plaintiff fails to provide any facts about that constitution. Indeed, the Court has only found cases in which Section 301 claims survive where plaintiffs allege facts about the constitutional provisions that are violated and allege facts about the conduct that violated those provisions. *See, e.g.*, *Farrell*, 367 F. Supp. 2d at 504–05 (holding that a *union* violated due process provision of its constitution and the LMRA by allowing attorney with conflict of interest to serve as counsel for trial committee and denying

charged *members* an opportunity to present evidence or make closing statements, where the *union constitution* expressly provided that charged *members* had the right to a "fair and impartial hearing," "to make an opening statement . . . , to offer witnesses and evidence, to confront and cross-examine witnesses, and to make a closing statement" (citation and quotation marks omitted)); *Monaco v. Smith*, No. 00-CV-5845, 2004 WL 203009, at *10 (S.D.N.Y. Feb. 2, 2004) (denying summary judgment on Section 301(a) claim where issues of material fact remained as to whether local union discharged the plaintiff without due process in violation of provisions of union constitution that detailed process for trial or suspension of elected officials); *Quinn v. Chiofalo*, No. 03-CV-1312, 2003 WL 22952859, at *12 (E.D.N.Y. Aug. 26, 2003) (denying motion to dismiss claim under Section 301(a) for removal of elected official without due process in violation of sections of union constitution that outline process of discipline and removal of *officers*).

Here, Plaintiffs have neither alleged any facts about the IBT Constitution, nor about the conduct that allegedly violated it. Plaintiffs thus tender naked assertions devoid of any factual enhancement. Accordingly, Plaintiffs' PSACs do not state Section 301(a) claims as to IBT and Raymond and the proposed amendments are futile with respect to these claims.

### 3. LMRDA Section 101(a)(2) Free Speech and Freedom of Assembly Claims

In Claim III, Plaintiffs allege that Local 812 Defendants, JC 16 Defendants, and IBT Defendants violated their free speech rights under Title I of the LMRDA, 29 U.S.C. § 411, by retaliating against them for speaking out against Local 812 and its leadership and for DeBellis's association with Ulrich. (Ulrich PSAC ¶¶ 126–31; DeBellis PSAC ¶¶ 89–94.) Defendants argue that Plaintiffs fail to state a claim because their speech was not protected by the LMRDA, fail to allege that Defendants had any knowledge of any portions of their speech that were protected,

fail to show that their suspension/termination infringed on any union membership rights, and that

their allegations remain far too conclusory to state a claim.  (IBT Defs.' Mem. re Ulrich 13–16;

Local 812 Defs.' Mem. re Ulrich 18–19; IBT Defs.' Mem. re DeBellis 12–16.)

In Claim IV, Plaintiffs allege Local 812 Defendants, JC 16 Defendants, and IBT

Defendants violated their freedom of assembly right guaranteed them under Section 101(a)(2) of

the LMRDA by preventing them from attending Executive Board and General Membership

meetings.  (Ulrich PSAC ¶¶ 132–35; DeBellis PSAC ¶¶ 95–97.)  Defendants argue that attending

board meetings is not protected by the LMRDA and that Plaintiffs fail to allege sufficient facts

that they were kept out of membership meetings.  (IBT Defs.' Mem. re Ulrich 18; Local 812

Defs.' Mem. re Ulrich 18–19; IBT Defs.' Mem. re DeBellis 16–17.)

### a.  Legal Standard

Section 101(a)(2) provides that,

> Every *member* of any labor organization shall have the right to meet and assemble
> freely with other members; and to express any views, arguments, or opinions; and
> to express at meetings of the labor organization his views, upon candidates in an
> election of the labor organization or upon any business properly before the meeting,
> subject to the organization's established and reasonable rules pertaining to the
> conduct of meetings.  Provided, [t]hat nothing herein shall be construed to impair
> the right of a labor organization to adopt and enforce reasonable rules as to the
> responsibility of every member toward the organization as an institution and to his
> refraining from conduct that would interfere with its performance of its legal or
> contractual obligations.

29 U.S.C. § 411(a)(2) (emphasis added) (italics omitted).  The purpose of this section is "to

encourage democratic self-governance in unions as well as to correct widespread abuses of

power and instances of corruption by union officials."  *Kazolias v. IBEWLU 363*, 806 F.3d 45,

51 (2d Cir. 2015) (citation and quotation marks omitted).  Title I is "designed to protected speech

in the context of the union democratic process, i.e. political speech primarily addressed to *other*

*union members*, rather than free speech at large."  *Sampson v. Dist. Council of N.Y.C. & Vicinity*

*of United Bhd. of Carpenters & Joiners of Am.*, No. 10-CV-8120, 2012 WL 4471535, at *3 (S.D.N.Y. Sept. 27, 2012) (citation and quotation marks omitted) (emphasis added).

"To successfully state a claim for retaliation in violation of the LMRDA, a plaintiff must establish the following: (1) his conduct constituted free speech under the LMRDA; (2) that the speech was a cause for the Union taking action against him; and (3) damages." *Leavey v. Int'l Bhd. of Teamsters–Theatrical Teamsters Local Union No. 817*, No. 13-CV-0705, 2015 WL 5802901, at *8 (S.D.N.Y. Oct. 5, 2015) (citation and quotation marks omitted); *Commer v. McEntee*, No. 00–CV–7913, 2006 WL 3262494, at *10 (S.D.N.Y. Nov. 9, 2006) (same). A plaintiff alleging a violation of Section 101(a)(2) must allege sufficient facts to suggest that the defendant's conduct was "part of a calculated and deliberate scheme to discourage dissent" among union members, rather than "ad hoc personal retaliation" against the plaintiff. *Maddalone v. Local 17, United Bhd. of Carpenters & Joiners of Am.*, 152 F.3d 178, 185 (2d Cir. 1998); *see also Franza*, 869 F.2d at 45 (explaining that in discerning Title I violations, "the question is whether an action against the official is merely an isolated act of retaliation for political disloyalty or is instead part of a purposeful and deliberate attempt to suppress dissent" (citation omitted)). As such, action taken by the union against an individual is cognizable under the LMRDA "only if that individual adequately pleads that he has become a symbol for a movement within the rank and file members, so that discipline of that person could be considered threatening to the exercise of Title I rights by union members generally." *Dilacio v. New York City Dist. Council of the United Bhd. of Carpenters & Joiners of Am.*, 593 F. Supp. 2d 571, 583 (S.D.N.Y. 2008) (quotation marks omitted) (quoting *Franza*, 869 F.2d at 45).

Title I's protections extend only to "speech of significant concern to the union membership as a whole," *Kazolias*, 806 F.3d at 52, and "primarily addressed to other union

members," *Helmer*, 759 F. Supp. at 176–77 (granting summary judgment to defendant on Section 101(a)(2) claim where the plaintiff alleged he was punished for cooperating with authorities investigating corruption among union leadership but did not show "that he ever voiced his belief in the corruption of the Local's leaders to his fellow members"); *see also Grant v. Communications Workers of America, Local 1101*, No. 16-CV-9553, 2017 WL 6000605, at *5–6 (S.D.N.Y. Dec. 1, 2017) (dismissing Section 101(a)(2) claim where the plaintiff failed to allege sufficient facts that his complaints to union officers were ever communicated to the union *membership* and that he was suspended *as a result of* his speech criticizing union policies); *Leavey*, 2015 WL 5802901, at *9 (holding that the plaintiff's complaints to the union's president and executive board were not protected speech under the LMRDA); *Kazolias v. IBEW LU 363*, No. 09-CV-7222, 2013 WL 3682926, at *8 (S.D.N.Y. July 1, 2013), *aff'd in relevant part sub nom.*, *Kazolias v. IBEWLU 363*, 806 F.3d 45 (2d Cir. 2015*)* (holding that EEOC and NLRB complaints filed by the plaintiff but never communicated to union members were not protected speech under Section 101(a)(2)); *Sampson*, 2012 WL 4471535, at *3–4 (dismissing Section 101(a)(2) claim where the plaintiff failed to allege that he was disciplined in retaliation for protected speech because his statements "relate[d] to the conduct of the proceedings and the specific charges against him," had nothing to do with the democratic governing of the union, and the communications were made to the trial committee and not to union members); *Monaco*, 2004 WL 203009, at *9 (holding that statements made by the plaintiff directly to his supervisor were not protected by LMRDA because they were not political speech related to the "democratic integrity of the union" and "not the type of speech that Title I of the LMRDA was designed to protect").

"The right of assembly conferred by [Section 101(a)(2)] was intended to enable union members to meet outside their regular union meetings for the purpose of discussing internal union affairs without fear of reprisal by union officials." *Yanity v. Benware*, 376 F.2d 197, 199–200 (2d Cir. 1967) (holding that the defendant's failure to call a meeting of the membership when requested to do so in accordance with the union constitution did not violate the plaintiffs' rights under Section 101(a)(2) (citation omitted)); *see also United Steelworkers of Am. v. Sadlowski*, 457 U.S. 102, 110 (1982) (finding that the legislative history of LMRDA shows that Section 101(a)(2) was intended to "give[] union members the right to assemble in groups, if they like, and to visit their neighbors and to discuss union affairs, and to say what they think, or perhaps discuss what should be done to straighten out union affairs, or perhaps discuss the promotion of a union movement, or perhaps a policy in which they believe." (citation omitted)). Further, although officers may have a right to participate in union policy-making, the "statutory rights of association and expression . . . are accorded only to union members acting as members and not to union officers acting solely in their official capacity." *Johnson v. Kay*, 860 F.2d 529, 536 (2d Cir. 1988) (citing *Finnegan*, 456 U.S. at 436–37).[21]

While the general rule is that status as a union employee or appointed officer is not a membership right within a union and is not protected by the LMRDA, *see Finnegan*, 456 U.S. at 438, the Second Circuit has "recognized an exception where the removal of a union officer was part of 'purposeful and deliberate attempt . . . to suppress dissent within the union,'" *Maddalone*, 152 F.3d at 184 (quoting *Schonfeld*, 477 F.2d at 904; *Cotter v. Owens*, 753 F.2d 223, 229 (2d Cir. 1985)). This narrow exception applies "where the removal of an officer or employee

---

[21] As for members, unions have "the power under the LMRDA to discipline a member by suspending his right to attend membership meetings." *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10*, 605 F.2d 1228, 1238 (2d Cir. 1979).

stemmed from longstanding and well-documented patterns of harassment and intimidation." *Maddalone*, 152 F.3d at 184; *see also Schonfeld*, 477 F.2d at 904 (upholding an LMRDA claim for removal of member from union office on the basis of a lengthy history of intra-union conflict); *Cotter*, 753 F.2d at 229–230 (finding fifteen-year history of litigation between a dissident group and leadership of one union local presented genuine issue as to motive underlying the removal of union committee member).

### b. DeBellis

DeBellis's PSAC is almost entirely devoid of allegations that he engaged in any speech at all, protected or not. DeBellis alleges he "challenged union leadership on his own behalf and on behalf of others due to his association with Ulrich, whether real or perceived and in voting against Acevedo's retention." (DeBellis PSAC ¶ 90.) DeBellis further alleges that Defendants associated Ulrich's complaints against them with DeBellis, and therefore retaliated against him. (*Id*. ¶ 48.) DeBellis alleges that the general union membership was aware of the consequences he suffered for his association with Ulrich because they were expressly warned not to have contact with him. (*Id*. ¶ 74.) For example, after DeBellis's deposition in January 2016, Weber and Vitta told other business agents not to speak to DeBellis. (*Id*. ¶ 43.) However, there are no allegations that DeBellis ever informed the union membership that he voted against Acevedo's retention, or that the membership was otherwise aware of it. There are no allegations that DeBellis ever addressed the union membership about complaints Ulrich had brought, or about the sexual harassment allegations DeBellis was deposed about. Nor is there any allegation that the union membership was even aware of Ulrich's complaints against Defendants, or that DeBellis had any relation to any complaints made by Ulrich. As for the General Membership's awareness of any protected speech by DeBellis, inasmuch as DeBellis alleges that Defendants

disparaged him to the General Membership, he alleges that Defendants told the General

Membership that DeBellis was terminated for taking bribes, not that DeBellis had opposed the

union leadership or raised concerns with them. Thus, DeBellis fails to allege that he engaged in

any speech "primarily addressed to other union members." *Helmer*, 759 F. Supp. at 176–77

(granting summary judgment to defendant on Section 101(a)(2) claim where the plaintiff claimed

he was punished for cooperating with authorities investigating corruption amongst union

leadership but did not show "that he ever voiced his belief in the corruption of the Local's

leaders to his fellow members"); *see also Grant*, 2017 WL 6000605, at *5–6 (dismissing Section

101(a)(2) claim where the plaintiff failed to allege sufficient facts that his complaints to union

officers were ever communicated to the union membership).

In additional to failing to allege that DeBellis engaged in protected speech, the Court

notes that with respect to IBT and JC 16, there is no allegation Defendants were aware of

DeBellis's association with Ulrich, DeBellis's vote not to hire Acevedo, or the union

membership being warned not to associate with DeBellis. As such, DeBellis cannot allege IBT

or JC 16 retaliated against him for speech he does not allege they knew about. *Cf. Leavey*, 2015

WL 5802901, at *8 (explaining that "[t]o successfully state a claim for retaliation in violation of

the LMRDA, a plaintiff must establish . . . that the speech was a cause for the Union taking

action against him"). DeBellis also alleges no facts showing that his termination and the

consequences of his termination were "part of a calculated and deliberate scheme to discourage

dissent" among union members, rather than "ad hoc personal retaliation" against him.

*Maddalone,* 152 F.3d at 185. DeBellis's allegation that he was told that he had taken "the wrong

side," (DeBellis PSAC ¶ 58), amounts to an "act of retaliation for political disloyalty"—an act

that the LMRDA was not drafted to, and does not, cover, *Franza*, 869 F.2d at 45 (noting that "[a]

litigant states a cognizable Title I claim when he demonstrates . . . a scheme to suppress dissent" but not where he alleges "merely [] isolated act[s] of retaliation for political disloyalty"). DeBellis does not allege that any members other than he and Ulrich were targeted or suffered any consequences because of any speech he and Ulrich engaged in. For example, DeBellis does not allege that he was "a symbol for a movement within the rank and file members." *Dilacio*, 593 F. Supp. 2d at 583; *see also Sampson*, 2012 WL 4471535, at *3–4 (dismissing Section 101(a)(2) claim where the plaintiff failed to allege that he was disciplined in retaliation for protected speech because his statements "relate[d] to the conduct of the proceedings and the *specific charges against him*," but had nothing to do with the democratic governing of the union (emphasis added)).

As for his freedom of assembly claim, DeBellis alleges he was "prevent[ed] from attending meetings *amongst Board Members* where union business was discussed, and decisions made." (DeBellis PSAC ¶ 96 (emphasis added).) DeBellis notably does not allege he was prevented from attending General Membership meetings, nor does he allege or argue that attending Board meetings was a membership right. And, indeed he cannot, as the statutory right of assembly provided by Section 101(a)(2) is "accorded only to union members acting as members and not to union officers acting solely in their official capacity as officers." *Johnson*, 860 F.2d at 536. DeBellis therefore cannot state a claim for the violation of a right he only enjoyed as a Board Member. Moreover, DeBellis fails to allege any reason for which he should be exempted from the general rule that union officer speech and status are not protected. *See Finnegan*, 456 U.S. at 438 (holding that status as a union employee or appointed officer is not a membership right within a union and is not protected by the LMRDA); *Johnson*, 860 F.2d at 536 (noting that the statutory right of associates is not accorded to union officers acting in their

official capacity).  As explained above, DeBellis fails to allege that actions taken against him were "part of a calculated and deliberate scheme to discourage dissent" *Maddalone,* 152 F.3d at 185 (holding that removal of union officer may be actionable under Title I if the removal was "part of a calculated and deliberate scheme to discourage dissent).  Finally, DeBellis fails to offer any details regarding who kept him out of Board meetings and how.  He does not specify any dates or times of meetings that he attempted to attend and was kept out of, nor does he allege that he ever received any kind of notification or warning not to attend Board meetings.

Accordingly, DeBellis's PSAC does not state LMRDA Section 101(a)(2) free speech and freedom of assembly claims and is futile with respect to these claims.

### c.  Ulrich

A vast majority of Ulrich's alleged protected speech in the PSAC consists of Ulrich's complaints to Local 812 officers, JC 16, the IBT, the IRB, Local 812's attorneys, and the Trustees of Local 812's Pension Fund.  Ulrich complained to Weber and demanded action regarding Vitta's sexual harassment, the improper payment of health benefits, and the misuse of Union Health and Pension Funds in September 2014, October 2014, December 2014, May 2015, November 2015, and December 2015.  (Ulrich PSAC ¶¶ 48–52.)  On December 2, 2015, Ulrich advised Weber of his intention to inform the Executive Board, IRB, 812 Pension Management Trustees, and the Local 812 General Membership of the second BettaWay Traffic Systems Contract, and that he intended to run against in the November 2017 election.  (*Id*. ¶¶ 48, 54.)  On January 16, 2016, Ulrich escalated his complaints to JC 16, IBT, and the IRB.  (*Id*. ¶ 62.)  On January 29, 2016, Grover sent a letter to the IRB again raising Ulrich's complaints of impropriety including but not limited to the BettaWay agreement.  (*Id*. ¶ 72.)  In or about January 2016, Ulrich advised the Pension Fund of Weber and Vitta's misconduct.  (*Id*. ¶ 107.)  During

this time Ulrich also communicated individually with Pension Fund Board Members concerning the misconduct. (*Id.* ¶ 108.) During the February 10, 2016, Executive Board hearing Ulrich reiterated his complaints and questioned why they were not investigated. (*Id.* ¶ 86.)

Thus, although it is true that Ulrich allegedly engaged in a substantial amount of speech with Board Members, trustees, other elected and appointed officials, and attorneys, the instances of speech here outlined were not "primarily addressed to other union members," *Helmer*, 759 F. Supp. at 176–77 (granting summary judgment to defendant on Section 101(a)(2) claim where the plaintiff claimed he was punished for cooperating with authorities investigating corruption amongst union leadership but did not show "that he ever voiced his belief in the corruption of the Local's leaders to his fellow members"); *see also Grant*, 2017 WL 6000605, at *5–6 (dismissing Section 101(a)(2) claim where the plaintiff failed to allege sufficient facts that his complaints to union officers were ever communicated to the union membership). These instances of speech are thus not protected by the LMRDA.

Unlike DeBellis, Ulrich does allege an instance of speech that even the IBT and JC 16 Defendants concede is protected. (IBT Defs.' Mem. re Ulrich 13, 16.) Ulrich alleges that in or around September or October 2015, he attended a shop steward seminar at which he informed a number of union members of various misconduct by Local 812 Defendants, including but not limited to, the improper hiring of family members, the improper granting of benefits, the improper hiring of a secretary without Board approval and in exchange for sexual favors, and the improper use of Health Fund resources. (Ulrich PSAC ¶ 46.) Ulrich alleges that at that time, Ulrich and DeBellis also informed "these union members" of their intention to run against

Defendants Weber and Vitta in the next elections to be held in 2017. (*Id.*)[22] Discussing alleged corruption by union leadership and future elections with the membership exemplifies "speech in the context of the union democratic process, i.e. political speech primarily addressed to other union members." *Sampson*, 2012 WL 4471535, at *3. However, Ulrich also has to show that this protected speech, "was a cause for the Union taking action against him," *Leavey*, 2015 WL 5802901, at *9, and there is no allegation that any Defendant was aware of this one instance of protected speech. Consequently, Defendants cannot have acted upon information Ulrich does not allege they possessed. *See Grant*, 2017 WL 6000605, at *5–6 (dismissing §101(a)(2) claim where the plaintiff failed to allege any facts to suggest that he was suspended *as a result* of his speech criticizing union policies). Thus, Ulrich fails to allege that any Defendant retaliated against him because of this protected speech.

Ulrich separately also alleges that he "challenged union leadership on his own behalf and on behalf of others," (Ulrich PSAC ¶¶ 127, 133), and that he paid a high price by being terminated/suspended, (*id.* ¶ 86), and "barred from meetings and interaction with the membership," (*id.* ¶ 70). Ulrich in essence argues that he spoke up against corrupt union leadership and misappropriation of Health and Pension Fund resources on behalf of all union members.

Plaintiffs cite *Kazolias*, 906 F.3d at 51, for the proposition that the purpose of Section 101(a)(2) is to "encourage democratic self-governance in unions as well as to correct widespread abuses of power and instances of corruption by union officials," and argue that Section 101(a)(2) applies here because "[c]orruption by union officials is precisely what is at issue in this case."

---

[22] The Court only considers the allegation that Ulrich and DeBellis announced their intention to run in deciding Ulrich's claims because this allegation appears only in Ulrich's PSAC. DeBellis does not make this allegation in his PSAC.

(Ulrich's Reply re Local 812 Defs. 8; DeBellis Reply re Local 812 Defs. 7.) However, neither the Supreme Court nor the Second Circuit has ever held that the LMRDA protects complaints by one union officer to other union leadership about specific instances of corruption. Indeed, courts in the Second Circuit have made clear that Title I of the LMRDA protects "speech in the context of the union democratic process, i.e. political speech," *Sampson*, 2012 WL 4471535, at *3, and is applicable only where a plaintiff "has become a symbol for a movement within the rank and file members," *Dilacio*, 593 F. Supp. 2d at 583. Ulrich does not allege that he was the leader of any faction, and DeBellis does not allege that he supported Ulrich's allegations against union leadership or that he was part of a dissenting group with Ulrich—DeBellis in fact alleges that he did not understand why he was "getting dragged into this," (DeBellis PSAC ¶ 55). DeBellis only alleges that he witnessed and was deposed about sexual harassment, (*id.* ¶ 26), and he does not allege having knowledge about any of Ulrich's other complaints, thus dooming this claim. *See Depperman v. Local 1199 Union*, No. 91-CV-6696, 1994 WL 225434, at *6 (S.D.N.Y. May 25, 1994) (granting motion to dismiss where the plaintiff failed to allege he was the leader of any identifiable dissent faction among the membership or identify other members who shared his allegedly dissident views); *Helmer*, 759 F. Supp. at 175–176 (granting summary judgment where the plaintiff failed to present evidence establishing that he was the leader of any identifiable dissent faction among the membership).

Ulrich also does not allege sufficient facts to show that union members were aware of, much less that they supported, any of the complaints he raised with union leadership—and his speech to union leadership only is not protected. *See Grant*, 2017 WL 6000605, at *6 (holding that plaintiff's complaints to union officers that were never communicated to other union members were not protected); *Leavey*, 2015 WL 5802901, at *9 (holding that plaintiff's

complaints to the union's president and executive board not were protected); *Monaco*, 2004 WL 203009, at \*9 (holding that speech directed by the plaintiff, an appointed business agent/elected vice-president, solely to his supervisor and the union's president was not protected); *Toner v. United Bhd. of Carpenters*, No. 96-CV-0023, 1999 WL 638602, at \*7 (S.D.N.Y. Mar. 30, 1999) (granting summary judgment on LMRDA claim where the plaintiffs "present[ed] no evidence that they ha[d] ever voiced their beliefs in the corruption of the union's leaders to the membership"); *Kazolias*, 2013 WL 3682926, at \*8 (holding that EEOC and NLRB complaints filed by the plaintiff but never communicated to union members were not protected speech).

Moreover, the removal of an officer or employee is only actionable as an LMRDA free speech violation where the action "stemmed from longstanding and well-documented patterns of harassment and intimidation." *Maddalone*, 152 F.3d at 184. Ulrich fails to allege a longstanding pattern of harassment and intimidation—to the contrary, Ulrich alleges he made numerous complaints over several years starting in 2014, (*see* Ulrich PSAC ¶ 48), and does not allege that he was retaliated against for those instances. Ulrich's allegations of retaliation begin with his December 2015 complaints to Weber and culminate in his February 2016 termination. Ulrich's back and forth with union leadership is neither longstanding, nor well-documented. *Cf. Schonfeld*, 477 F.2d at 904 (upholding an LMRDA claim for removal of member from union office on the basis of a lengthy history of intra-union conflict); *Cotter*, 753 F.2d at 229–230 (finding fifteen-year history of litigation between a dissident group and leadership of one union local presented genuine issue as to motive underlying the removal of union committee member).

As for his freedom of assembly claim, Ulrich alleges that he was "locked out of the offices of Local 812 . . . [and] barred from meetings and interaction with the membership." (Ulrich PSAC ¶ 70). He also alleges that Defendants prevented him from attending Executive

and General Membership meetings.  (*Id*. ¶¶ 132–35.)  Ulrich does not allege that attending Board meetings was a membership right.  And indeed he cannot, because the statutory right to assemble provided by Section 101(a)(2) is "accorded only to union members acting as members and not to union officers acting solely in their official capacity as officers."  *Johnson*, 860 F.2d at 536. Ulrich cannot state a claim for the violation of a right he only enjoyed as a Board Member. Moreover, he fails to allege any reason why he should be exempted from the general rule that union officer speech and status are not protected.  *See Finnegan*, 456 U.S. at 438 (holding that status as a union employee or appointed officer is not a membership right within a union and is not protected by the LMRDA); *Johnson*, 860 F.2d at 536 (noting that the statutory right of associates is not accorded to union officers acting in their official capacity).  As explained above, Ulrich fails to allege that actions taken against him were "part of a calculated and deliberate scheme to discourage dissent."  *Maddalone,* 152 F.3d at 185.

With respect to being kept out of General Membership meetings, Ulrich fails to offer any details regarding who kept him out of union meetings and how.  He does not specify any dates or times of meetings that he attempted to attend and was kept out of, nor does he expressly allege that he ever received any kind of notification or warning not to attend membership meetings.

Ulrich's naked allegation that he was prevented from attending meetings with the membership is not enough to state a plausible claim.[23] [24]

Neither Ulrich nor DeBellis alleges he was prevented from meeting with other union members "outside their regular union meetings for the purpose of discussing internal union affairs," *Yanity*, 376 F.2d at 199–200 ("The right of assembly conferred by [Section 101(a)(2)] was intended to enable union members to meet outside their regular union meetings for the purpose of discussing internal union affairs without fear of reprisal by union officials."), or that they could not "visit their neighbors and [] discuss union affairs, . . . say what they think, or

---

[23] Local 812 Defendants improperly submit extraneous evidence to argue that Ulrich did not have a right to attend Executive Board meetings after he was terminated, according to the Local 812 By-laws, (*see* Cary Decl. ¶ 37, Ex. B), and that in his deposition he admitted that he incorrectly assumed he was banned from attending membership meetings, (*see* Cary Decl. ¶ 36, Ex. A). (Local 812 Defs.' Mem. re Ulrich 19–20.) The Court does not consider these documents in deciding the Motions before it because a district court "must [generally] confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F.*, 199 F.3d at 107. The Court need not consider these documents in any event because it dismisses Ulrich's LMRDA § 101(a)(2) claims based on Ulrich's deficient pleadings alone.

[24] It is worth noting that courts in the Second Circuit have rarely sustained claims that a union official's *assembly rights* specifically were violated, and where they have, they have concluded that the union official pleaded sufficient facts that he or she had "become a symbol for a movement within the rank and file members," *Dilacio*, 593 F. Supp. 2d at 583, and that actions taken against him or her were "part of a calculated and deliberate scheme to discourage dissent," *Maddalone,* 152 F.3d at 185. In *Johnson*, for example, the Second Circuit found that a local union president stated free speech and assembly rights claims under Section 101(a)(2) where her opponent, the secretary treasurer, allegedly directed 35 of his supporters to invade an executive council meeting and stare the president down in a menacing way, directed his supporters to go to delegate assembly meetings and crowd the microphone so that no supporters of the president could speak, at one point ripping away a microphone from one of her supporters, where the treasurer's supporters charged the stage when the president and her supporters were attempting to speak, seized the union headquarters and kept the president and her supporters out, and blocked the president's access to the union newspaper and attempted to keep her from communicating with the union membership. 860 F.2d at 536–37. Ulrich and DeBellis's allegations are miles away from such a sufficiently pleaded assembly right claim under Section 101(a)(2).

perhaps discuss what should be done to straighten out union affairs," *Sadlowski*, 457 U.S. at 110 (finding that Section 101(a)(2) was intended to "give[] union members the right to assemble in groups, if they like, and to visit their neighbors and to discuss union affairs, and to say what they think, or perhaps discuss what should be done to straighten out union affairs . . . ."). They do not allege that they attempted to and were prevented from exposing 812 Local Defendants' alleged misconduct to the union membership or the authorities or to anyone else. Nor does Ulrich allege that once he believed that Local 812 would not act on his complaints, he tried to bring his concerns to the union membership, at a meeting or "outside their regular meetings," *Yanity*, 376 F.2d at 199–200, and was prevented from doing so.

To be sure, some of the allegations Ulrich raises against Local 812 leadership are troubling. "However, neither § 101(a)(2) nor the LMRDA as a whole were intended to eliminate all threats to union democracy." *Commer v. Keller*, 64 F. Supp. 2d 266, 272–73 (S.D.N.Y. 1999) (citation, alterations, and quotation marks omitted). "Congress did not intend Title I of the LMRDA to create a panoply of rights to which all persons injured in some way relating to a union may turn when seeking redress." *Phelan v. Local 305 of the United Ass'n of Journeymen*, 973 F.2d 1050, 1055 (2d Cir. 1992) (citation omitted). Ulrich's clashes with other union officers are simply not the focus of § 101(a)(2)'s protection of the freedom of speech and assembly. Ulrich has failed to allege that his rights as a member were interfered with in a manner that threatens union democracy.

Accordingly, because the PSAC does not state LMRDA § 101(a)(2) free speech and freedom of assembly claims, it is futile with respect to these claims.[25]

---

[25] Ulrich, like DeBellis, alleges that the general union membership was aware of the consequences he suffered for airing grievances against the Defendants on the union membership's behalf, and that the membership was expressly warned not to have contact with

4.  ERISA Section 510 Retaliation and Whistleblower Claims

In Count V, Plaintiffs allege Local 812 Defendants, Health Fund Defendants, and Pension Fund Defendants, retaliated against them for exercising rights they were entitled to under the Health Plan, Pension Plan, and ERISA, in violation of the whistleblower provision of Section 510 of ERISA, 29 U.S.C. § 1140.  (Ulrich PSAC ¶¶ 136–39; DeBellis PSAC ¶¶ 98–101.) In Count VI, Plaintiffs allege Health Fund and Pension Fund Defendants retaliated against them for exercising rights they were entitled to as "participant[s]" and "beneficiar[ies]" under the Health Plan, Pension Plan, and ERISA, also in violation of Section 510.  (Ulrich PSAC ¶¶ 140–43; DeBellis PSAC ¶¶ 102–105.)  Defendants argue that Plaintiffs fail to establish a prima facie case of retaliation under Section 510, fail to allege a violation of the Section 510 whistleblower provision because voluntary provision of information is not protected activity, and fail to seek appropriate equitable relief as required by the enforcement provision of Section 510.  (Pension Fund Defs.' Mem. re Ulrich 6–10; Local 812 Defs.' Mem. re Ulrich 20–21; Pension Fund Defs.' Mem. re DeBellis 1–2; Local 812 Defs.' Mem. re DeBellis 17–18.)

a.  Legal Standard

Section 510 provides that it is

> unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a *participant or beneficiary* for exercising any right to which he is entitled under the provisions of an employee benefit plan, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, . . . [and] [i]t shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has *given information or has testified or is about to testify* in any inquiry or proceeding relating to this chapter . . . .

---

him.  (DeBellis PSAC ¶ 74.)  Inasmuch as Ulrich alleges that Defendants disparaged him to the General Membership, he alleges that Defendants told the General Membership that he was terminated for taking bribes, not that he had raised complaints on behalf of the union's membership.  There are no allegations in Ulrich's PSAC that the union membership knew of the fight he was allegedly fighting on their behalf.

29 U.S.C. § 1140 (emphasis added). The first portion, or the retaliation provision, of Section 510 of ERISA "was designed primarily to prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Ello v. Singh*, 531 F. Supp. 2d 552, 569 (S.D.N.Y. 2007) (quoting *Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1111 (2d Cir. 1988)). "[C]ourts in this district have therefore held that [Section] 510 only proscribes interference with the employment relationship." *Roe v. Empire Blue Cross Blue Shield*, No. 12-CV-4788, 2014 WL 1760343, at *4–5 (S.D.N.Y. May 1, 2014) (citations, alteration, and quotation marks omitted) (collecting cases), *aff'd*, 589 F. App'x 8 (2d Cir. 2014); *see also Zeuner v. Suntrust Bank Inc.*, 181 F. Supp. 3d 214, 221–22 (S.D.N.Y. 2016) ("Section 510 is designed to protect the employment relationship that gives rise to an individual's benefit rights, not to create an action for wrongfully withheld benefits." (citation and quotation marks omitted)).

To make out a prima facie case of retaliation under Section 510, Plaintiffs must show that, "(1) [they were] engaged in a protected activity, (2) [Defendants were] aware of that activity, (3) [Plaintiffs] suffered from an adverse employment decision and (4) there was a causal connection between the protected activity and the adverse employment action." *Giordano v. Thomson*, 564 F.3d 163, 169 (2d Cir. 2009) (citation omitted); *Karagozian v. Coty US, LLC*, No. 10-CV-5482, 2011 WL 536423, *3 (S.D.N.Y. Feb. 10, 2011) (same). Moreover, Plaintiffs must plead that Defendants "had the specific intent to retaliate against [them.]" *Giordano*, 564 F.3d at 169; (citations omitted); *Diamond v. Local 807 Labor-Mgmt. Pension Fund*, No. 12-CV-5559, 2014 WL 527898, at *12 (E.D.N.Y. Feb. 7, 2014) (same), *aff'd*, 595 F. App'x 22 (2d Cir. 2014). "For Plaintiff[s'] claim[s] to survive a motion to dismiss, [they] must plead that the [Defendants'] motivation for terminating [their] employment was to deny [them] a right

protected under Section 510." *Ello*, 531 F. Supp. 2d at 570 (citation omitted). The Second Circuit and the lower courts within the Second Circuit, have made clear that "no claim 'lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind,' an adverse employment action." *Tavoloni v. Mount Sinai Med. Ctr.*, 26 F. Supp. 2d 678, 680 (S.D.N.Y. 1998) (quoting *Dister*, 859 F.2d at 1111), *aff'd*, 198 F.3d 235 (2d Cir. 1999).

As to the second portion of Section 510, namely the "whistleblower provision," *Hashimoto v. Bank of Hawaii*, 999 F.2d 408, 411 (9th Cir. 1993) (describing the two portions of Section 510 as the retaliation and the whistleblower provisions respectively); *Klein v. Banknorth Grp., Inc.*, 977 F. Supp. 302, 304 (D. Vt. 1997) (same) (citations omitted), although the caselaw is not especially voluminous, courts have generally found that voluntarily offering information is not protected activity. *See, e.g., Nicolaou v. Horizon Media, Inc.*, 402 F.3d 325, 329–30 (2d Cir. 2005) (concluding that unsolicited internal complaints are not protected activity under Section 510, but that the plaintiff's actions would fall within the protection of Section 510 if she could demonstrate *she was contacted by her employer's counsel* to provide information related to funding of employer's 401(k) plan); *Fraser v. Fiduciary Tr. Co. Int'l*, 417 F. Supp. 2d 310, 320 (S.D.N.Y. 2006) (granting motion to dismiss because the plaintiff failed to allege "that he gave information in connection with an [ERISA] 'inquiry'" (ultimately citing *Nicolao*, 402 F.3d at 328–29); *Klein*, 977 F. Supp. at 304–05 (holding that Section 510 would shield the plaintiff from retaliation if she had provided documents in the course of an "inquiry or proceeding relating to ERISA violations," but not where she provided documents and information to her own attorney during a discrimination case *not* "in anticipation of any ERISA-related inquiry").[26]

---

[26] A few courts in the Second Circuit have held that unsolicited internal inquiries may constitute protected activity. *See, e.g., Ello*, 531 F. Supp. 2d at 573 (finding that the plaintiff's allegations that he attempted to schedule meetings with union decision makers to provide

### b. Ulrich

As to the Pension Fund, Ulrich alleges that "he was removed as a Trustee of the Pension Fund . . . specifically to interfere, prevent and chill [him] from protecting his Pension rights." (Ulrich PSAC ¶ 88.)[27]  He alleges that the Pension Fund and its Trustees failed to accept or investigate his complaints about Weber, Vitta, and Surdi's involvement in negotiating the allegedly improper BettaWay agreement that exacerbated problems with the already-underfunded Retirement Fund.  (*Id.* ¶¶ 46−48, 107−09, 113.)  Ulrich further alleges that the Pension Fund Defendants' failure to act upon his complaint resulted in a multimillion-dollar loss of value to the Pension Fund and affected the benefits Ulrich and other members would receive, (*id.* ¶ 113), and caused him "to be damaged in loss of position, prestige, and appropriate pension benefits," (*id.* ¶ 114).  Ulrich also alleges that Local 812 caused him to cease his position as a

_____

information about suspected fraud in benefits disbursement could constitute a Section 510 whistleblower claim even though the "[p]laintiff does not allege he was responding to, or providing information to, a formal inquiry); *Vasquez v. Zenith Travel, Inc.*, No. 00-CV-0855, 2000 WL 1532953, at *4 (S.D.N.Y. Oct. 16, 2000) (holding that the "plaintiff's formative inquiries" to her employers as to a discrepancy between plaintiff's payroll records and her 401(k) balance were protected activity under the whistleblower provision of Section 510 (citation omitted)), *aff'd*, 14 F. App'x 97 (2d Cir. 2001).  However, *Vasquez* predates *Nicolaou* and involved very specific allegations of discrepancies between promised benefits and benefits paid.  And *Ello* did not consider *Nicolaou*.

[27] For purposes of deciding whether Plaintiffs make out a Section 510 claim as to any group of Defendants, it is important to note that several of the individual Defendants are included in multiple Defendant groupings.  Weber, Vitta, Surdi, and Visconti, for example, are each named by Plaintiffs as part of the Local 812 Defendants, Health Fund Defendants, and Pension Fund Defendants, because they each had official roles within Local 812 and the Funds respectively.  (Ulrich PSAC ¶¶ 115–19; DeBellis PSAC ¶¶ 78–82.)  At all relevant times, Weber was President of Local 812, Trustee of the Pension Fund, and Chairman Trustee of the Health Fund.  Vitta was Secretary Treasurer of Local 812, Trustee of the Pension Fund and of the Health Fund.  Visconti was Vice President of Local 812, Trustee of the Pension Fund and of the Health Fund, and Surdi was Recording Secretary of Local 812 and a Trustee of the Health Fund.  (See Ulrich PSAC ¶¶ 1–18.)  The Court does not consider Pension Fund Defendants, Health Fund Defendants, and Local 812 Defendants' actions in isolation given that several of the decision makers across each of those entities allegedly were one and the same.

Pension Fund Trustee by virtue of his dismissal as Vice President. (*Id*. ¶ 87.) Ulrich was never officially advised that he was removed as a Trustee of the Pension Fund, but since February 10, 2016, he has not received any notice of meetings, communications or Pension fund business, and for all intents and purposes has been removed de facto. (*Id*. ¶ 88.) With respect to Local 812 Defendants, Ulrich alleges he was terminated for engaging in the protected activity of reporting the BettaWay agreement and the improper use of health funds. (*Id*. ¶ 48.)

As to the Health Fund, Ulrich alleges that Weber, Vitta, Alvarez, and Marsh caused the Health Fund to assume costs for medical treatments that they or their relatives received that were not covered by the Health Fund's plan. (*Id*. ¶¶ 49–50, 52.) Ulrich alleges that he raised these complaints with the Health Fund Trustees and Health Fund's counsel. (Ulrich PSAC ¶¶ 80, 86.) At the conclusion of the February 10, 2016 Health Fund meeting, Ulrich was suspended as a Health Fund Trustee by vote. (*Id*. ¶ 86.)

Ulrich has failed to allege a prima facie case for retaliation under Section 510. Ulrich has not alleged, as the plain words of the statute require, that his rights were impaired as a result of "exercising a[ ] right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C. § 1140. "Only rights referenced in Section 510, typically *plan benefits*, are protected." *Ello*, 531 F. Supp. 2d at 570 (emphasis added); *see also Allen v. Verizon Wireless*, No. 12-CV-482, 2015 WL 3868672, at *15 (D. Conn. June 23, 2015) (holding that appealing a denial of short-term disability coverage by an insurer was a protected activity under Section 510), *on reconsideration*, 2015 WL 4751031 (D. Conn. Aug. 11, 2015), *and aff'd*, 667 F. App'x 4 (2d Cir. 2016). However, conclusory allegations about decreases in the value of the Pension and Health Funds are insufficient to state a claim under Section 510. *See White v. Univ. of Rochester, Strong Mem'l Hosp.*, No. 12-CV-6288, 2012 WL 3598210, at *4 (W.D.N.Y. Aug. 20,

2012) (holding that the plaintiff's conclusory assertion that defendant had impaired her "rights to retire with a proper level of paid benefits in accordance with the [d]efendant's employee benefit plan" was not actionable because she could not point to a provision of the benefit plan that entitled her to retire with any particular status).  Ulrich does not allege that he will not receive pension benefits from the Pension Fund, nor does he allege that the Pension Fund plan entitled him to receive a particular amount of pension benefits and that as a result of the BettaWay agreement he will no longer receive that amount.  Indeed, Ulrich alleges no facts whatsoever about what benefits he was entitled to under the plan and which of those benefits he is currently being, or will in the future be, denied.  Similarly, Ulrich makes no allegations about what benefits he stood to receive from the Health Fund and how those benefits were impacted by the allegedly improper assumption of costs.  And Ulrich's status as a Pension and Health Fund Trustee and the ability to attend fund meetings alone are not "plan benefits" and "are not actionable under Section 510."  *See Ello*, 531 F. Supp. 2d at 570–71 (holding that the right to attend a trustees' meeting, to have access to fund records, and to retain status as a trustee are not protected under Section 510).

Given that Ulrich has failed to allege that he engaged in protected activity, he cannot plead a causal connection between a protected activity and an adverse employment action. *Green v. Nat'l Grid.,* No. 07-CV-60, 2010 WL 3369548, at *8 (W.D.N.Y. Aug. 24, 2010) (holding that "[w]hile [the] [p]laintiff's [a]mended [c]omplaint is replete with allegations of his complaints to management and his union, and subsequent retaliation . . . none of his alleged 'protected activity' involves an exercise of his rights under an employee benefit plan[, and] [c]onsequently, there also are no fact allegations indicating a causal connection between any adverse action and the exercise of ERISA rights").

Ulrich also fails to allege that Defendants had the requisite "specific intent to retaliate against him." *See Giordano*, 564 F.3d at 169. With respect to the Health Fund, he makes no allegations whatsoever that he was terminated with any intent to deny him a right under Section 510. Regarding the Pension Fund, Ulrich alleges that "he was removed as a Trustee of the Pension Fund . . . specifically to interfere, prevent and chill [him] from protecting his pension rights." (Ulrich PSAC ¶ 88.) This is insufficient to plead that any Defendant's "motivation for terminating [Ulrich's] employment was to deny him a right protected under Section 510," *Ello*, 531 F. Supp. 2d at 569 (citation omitted); *see also Maack v. Wyckoff Heights Med. Ctr.*, No. 15-CV-3951, 2016 WL 3509338, at *12 (S.D.N.Y. June 21, 2016) (granting motion to dismiss Section 510 claim because the plaintiff alleged "only in conclusory fashion that her termination 'prevented [her from] obtaining full retirement benefits'"); s*ee White*, 2012 WL 3598210, at *4 (W.D.N.Y. Aug. 20, 2012) (holding that the plaintiff's conclusory assertion that defendant had impaired her "rights to retire with a proper level of paid benefits in accordance with the [d]efendant's employee benefit plan" was not actionable because she could not point to a provision on the benefit plan that entitled her to retire with any particular status).[28] Accordingly, the Court concludes that Ulrich has failed to state a Section 510 retaliation claim.

Ulrich also fails to state a § 501 whistleblower claim. Ulrich alleges that he repeatedly raised complaints about the Pension and Health Funds with Union and Fund leadership, (Ulrich PSAC ¶¶ 24, 27, 48, 54, 62), and that they failed to investigate those complaints, (*id.* ¶¶ 107–09,

---

[28] Pension and Health Fund Defendants also argue that Ulrich did not suffer an adverse employment action at the hands of the Pension or Health Funds, because it was the Union that terminated his employment. (Pension Fund Defs.' Mem. re Ulrich 7; Local 812 Defs.' Mem. re Ulrich 21; Pension Fund Defs.' Mem. re DeBellis 1–2; Local 812 Defs.' Mem. re DeBellis 18.) Because the Court decides that Ulrich has failed to state two of the elements of a prima facie case of retaliation under Section 510 and has failed to allege the requisite specific intent required to make out such a case, it need not address whether Ulrich suffered an adverse employment action.

111−13).  However, Ulrich's voluntary unsolicited internal complaints are not protected activity under Section 510.  *See Nicolaou*, 402 F.3d at 329–30 (holding that unsolicited internal complaints are not protected activity under Section 510).

Accordingly, Ulrich's PSAC does not state retaliation and whistleblower claims under Section 510 of ERISA and is futile with respect to these claims.

### c.  DeBellis

Like Ulrich, DeBellis summarily alleges that he was harmed as a beneficiary of the Pension Fund because the BettaWay contract negotiated by Weber, Vitta, and Surdi, devalued the Pension Fund.  (DeBellis PSAC ¶ 32.)  Following the February 10, 2016 Health Fund and Executive Board meetings, DeBellis was terminated from his position as business agent and "suspended" and "removed" as Trustee of the Health Fund.  (*Id.* ¶¶ 27–28, 55.)  DeBellis also alleges that he exercised unspecified rights under the Health and Pension plans and was retaliated against for doing so.  (*Id.* ¶¶ 99–100, 103–04.)  With respect to these allegations, DeBellis's claims fare no better than Ulrich's nearly identical and inadequate claims.  DeBellis fails to allege a prima facie case for retaliation under Section 510 and fails to allege Defendants had the requisite specific intent to make out of a Section 510 retaliation claim.  *See Giordano*, 564 F.3d at 169 (explaining that a plaintiff must both make out a prima facie case of retaliation under Section 510 and prove that defendants "had the specific intent to retaliate" in order to make out a Section 510 claim); *see supra* Section II.B.4.b.

However, DeBellis alleges a few additional facts that warrant further discussion.  First, DeBellis alleges that on February 18, 2016, Russo threatened his pension and medical benefits after a General Membership meeting.  (Ulrich PSAC ¶ 93; DeBellis PSAC ¶ 58.)  This is the one allegation in DeBellis's PSAC that could be construed to suggest his pension and health benefits

were somehow related to his termination—but it falls short. Russo was a retired Vice President of Local 812, (Ulrich PSAC ¶ 69), and is not a named Defendant in this case. DeBellis does not allege that Russo made this threat on behalf of anyone, or that Russo had any involvement with the BettaWay agreement or any influence over DeBellis's pension and health benefits. In the absence of any other factual allegations that Defendants' "motivation for terminating [DeBellis's] employment was to deny him a right protected under Section 510," *Ello*, 531 F. Supp. 2d at 569, DeBellis, like Ulrich, cannot plausibly plead that Defendants had the requisite specific intent to make out a Section 510 claim. *See Maack*, 2016 WL 3509338, at *12 (granting motion to dismiss Section 510 claim because the plaintiff alleged "only in conclusory fashion that her termination 'prevented [her from] obtaining full retirement benefits'").

Second, DeBellis alleges that his health benefits were temporarily discontinued after he was terminated. He alleged he did not receive timely notification of COBRA benefits, his retiree health benefits were improperly delayed, and he had to pay $1146 for COBRA Benefits to maintain coverage. (DeBellis PSAC ¶¶ 29, 65, 68.) By July 2016, however, DeBellis's medical benefits were reinstated, and his COBRA payments were refunded. (*Id.* ¶¶ 75–76.) DeBellis does not allege that his health or pension benefits are still disrupted or will be disrupted in the future. Nor does he allege that any Defendant intentionally caused his health benefits to be temporarily disrupted after his termination. "[N]o claim 'lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind,' an adverse employment action." *Tavoloni*, 26 F. Supp. 2d at 680 (quoting *Dister*, 859 F.2d at 1111). DeBellis does not allege that he was terminated "in order to keep [him] from obtaining vested pension rights." *Ello*, 531 F. Supp. 2d at 569. To the contrary, DeBellis alleges that he was terminated by Defendants for his association with Ulrich. (DeBellis PSAC ¶¶ 26, 89–94.) Association with other union members,

even ostracized ones, is not a right referenced in Section 510, and "[o]nly rights referenced in Section 510, typically *plan benefits*, are protected." *Ello*, 531 F. Supp. 2d at 570 (emphasis added); *see also Allen*, 2015 WL 3868672, at \*15 (holding that appealing a denial of short-term disability coverage by an insurer was a protected activity under Section 510). Accordingly, the Court concludes that DeBellis has failed to allege a Section 510 retaliation claim.

DeBellis also does not state a whistleblower complaint under ERISA because he does not, even summarily, allege that he raised any concerns about the Health or Pensions Funds with anyone, internally or externally. DeBellis alleges he was deposed about the sexual harassment allegations against Vitta, (DeBellis Am. Compl. ¶ 26), but he does not allege facing an inquiry about any other matter. Accordingly, DeBellis's PSAC does not state retaliation and whistleblower claims under Section 510 of ERISA and is futile with respect to these claims.[29]

---

[29] Pension Fund Defendants also argue that Plaintiffs' claims are futile because they fail to seek appropriate equitable relief, as required by the enforcement provision in Section 510, specifically Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). (Pension Fund Defs.' Mem. re Ulrich 9–10 (citing *Mcguigan v. Local 295/Local 851 I.B.T. Emp'r Grp. Pension Plan*, No. 11-CV-2004, 2011 WL 3421318, at \*4 (E.D.N.Y. Aug. 4, 2011) (holding that Section 502(a)(3) "authorizes solely equitable relief" (emphasis omitted) (quoting *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 578–79 (2d Cir. 2006))).) Plaintiffs seek legal remedies "including but not limited to make-whole relief, including attorneys' fees and costs incurred in defense of the charges against him." (Ulrich PSAC ¶¶ 139, 143, 147; DeBellis PSAC ¶¶ 101, 105, 109.) The Court dismisses Plaintiffs' Section 510 claims on other grounds, so it need not decide whether Plaintiffs seek appropriate relief. However, the Court notes that "[c]ompensatory damages and other traditional forms of legal relief are [generally] unavailable under Section 502(a)(3)." *Wharton v. Duke Realty, LLP*, 467 F. Supp. 2d 381, 391 (S.D.N.Y. 2006) (citing *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993)); *see also Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317, 321 (2d Cir. 2003) (noting that compensatory and punitive damages are never available under Section 502(a)(3)); *Severstal Wheeling Inc. v. WPN Corp.*, 809 F. Supp. 2d 245, 262–63 (S.D.N.Y. 2011) (concluding that claims for unspecified injunctive or equitable relief and generic claims for relief as the court deems proper are insufficient to state a claim under Section 502(a)(3)), *aff'd sub nom.*, *Severstal Wheeling Inc. v. WHX Corp.*, 659 F. App'x 28 (2d Cir. 2016).

## 5.  ERISA Section 404 Breach of Fiduciary Duty Claims

In Claim VII Plaintiffs allege the Health and Pension Fund Defendants breached their fiduciary duty to the Funds in violation of Section 404 of ERISA, 29 U.S.C. §§ 1104, 1106, "by instigating and/or permitting the renegotiated [of the BettaWay agreement] to the detriment of the Pension Fund and the improper payouts to the detriment of the Health Fund," and by participating in and approving the improper removal of Plaintiffs as Trustees of the Health and Pension Funds.  (Ulrich PSAC ¶¶ 144–47; DeBellis PSAC ¶¶ 106–09.)  Defendants argue that Plaintiffs' fiduciary duty claims are futile because Plaintiffs (1) do not allege that Defendants took any action in violation of their fiduciary duties, (2) do not have standing to bring claims for breach of fiduciary duties, and (3) improperly seek recovery of individual relief rather than relief on behalf of the plans.  (Pension Fund Defs.' Mem. re Ulrich 10–13; Local 812 Defs.' Mem. re Ulrich 21–25; Pension Fund Defs.' Mem. re DeBellis 2; Local 812 Defs.' Mem. re DeBellis 18–21.)[30]

### a.  Legal Standard

"In every case charging breach of ERISA fiduciary duty[,] the threshold question is whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366 (2d Cir. 2014) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000) (alterations omitted)); *Patrico v. Voya Fin., Inc.*, No. 16-CV-7070, 2018 WL 1319028, at *3 (S.D.N.Y. Mar.

---

[30] Notably, Plaintiffs do not cite a single case in support of their Section 404 ERISA breach of fiduciary duty claims in their opposition papers.  (*See generally* Ulrich's Reply re Local 812 Defs.; Ulrich's Reply re Pension Fund Defs.; DeBellis's Reply re Local 812 Defs.; DeBellis's Reply re Pension Fund Defs.).  Instead, without any reference to caselaw in the Second Circuit or anywhere else, Plaintiffs argue that, "[i]t would be a terrible irony if corrupt abusers like the Defendants could strip any plaintiff of standing merely by removing him from union membership."  (Ulrich's Reply re Local 812 Defs. 9.)

13, 2018) (same), *appeal filed*, No. 18-1057 (2d. Cir. Apr. 12, 2018).  "[A] person may be an

ERISA fiduciary with respect to certain matters but not others."  *Coulter*, 753 F.3d at 366

(citation omitted); *see also Ello*, 531 F. Supp. 2d at 566 ("[W]hether or not an individual or

entity is an ERISA fiduciary must be determined by focusing on the function performed . . . ."

(citation omitted)).  A "person is a fiduciary with respect to a plan, and therefore subject to

ERISA fiduciary duties, to the extent that he or she exercises any discretionary authority or

discretionary control respecting management of the plan, or has any discretionary authority or

discretionary responsibility in the administration of the plan."  *Varity Corp. v. Howe*, 516 U.S.

489, 498 (1996) (citation and quotation marks omitted).  Section 404 of ERISA describes four

affirmative duties for fiduciaries: (1) exclusive purpose; (2) prudence; (3) diversification; and (4)

acting in accordance with the plan.  *See* 29 U.S.C. § 1104(a)(1)(A)–(D).

      Section 502(a)(2) authorizes relief for the benefit of the plan only.  *See Mass. Mut. Life*

*Ins. Co. v. Russell*, 473 U.S. 134, 141 (1985) (holding that "§ 502(a)(2) authorizes a beneficiary

to bring an action against a fiduciary . . . [where] recovery for a violation [] inures to the benefit

of the plan as a whole").  "In order to bring a breach of fiduciary duty action pursuant to

§ 502(a)(2) of ERISA, a plan participant is required to sue 'in a representative capacity on behalf

of the plan as a whole.'"  *Mcguigan v. Local 295/Local 851 I.B.T. Emp'r Grp. Pension Plan*, No.

11-CV-2004, 2011 WL 3421318, at *3 (E.D.N.Y. Aug. 4, 2011) (quoting *Russell*, 473 U.S., at

142 n.9); *see also Coan v. Kaufman*, 457 F.3d 250, 259 (2d Cir. 2006) ("The central holding of

*Russell* is that sections 409 and 502(a)(2) of ERISA do not provide for the recovery of extra-

contractual damages for breaches of fiduciary duty that affect only an individual plaintiff."

(citing *Russell*, 473 U.S. at 136–37); *Bona v. Barasch*, No. 01-CV-2289, 2003 WL 1395932, at

*9 (S.D.N.Y. Mar. 20, 2003) ("Individual [p]laintiffs cannot recover damages on their own behalf under Section 502(a)(2)." (citing *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d. Cir. 1993))).[31]

### b. Application

Here, Plaintiffs fail to identify which of the Section 404 ERISA fiduciary duties Health and Pension Fund Defendants allegedly breached. Plaintiffs allege Pension and Health Fund Defendants breached their fiduciary duties "by instigating and/or permitting the renegotiated [BettaWay agreement] . . . and the improper payouts to the detriment of the Health Fund," and by participating in and approving the improper removal of Plaintiffs as Trustees. (Ulrich PSAC ¶¶ 144–47; DeBellis PSAC ¶¶ 106–09.) However, the allegedly improper removal of Plaintiffs as Trustees of the Health and Pension Funds was not a fiduciary act. *See Ello*, 531 F. Supp. 2d at 565 (holding that a decision to preclude the plaintiff from attending a Trustees' meeting and accessing fund records, "even if true, does not state a breach of fiduciary duty recognized by statute, any plan, or the common-law"); *Ancekewicz v. Long Island Univ.*, No. 02-CV- 4490, 2005 WL 1411917, at *8 (E.D.N.Y. June 15, 2005) ("ERISA's goal of protecting [pension and other] benefits from interference does not transform ERISA's statutory scheme into a federal job protection scheme." (citation omitted)). The allegedly improper renegotiating of the BettaWay

---

[31] The Court notes that Section 502 only names three classes of persons who may commence an action for breach of a fiduciary duty: (1) a participant or beneficiary, (2) the Secretary of Labor, and (3) a fiduciary. 29 U.S.C. § 1132(a); *see also Ello*, 531 F. Supp. 2d at 564 ("Section 1132 is the provision which defines the scope of the court's subject matter jurisdiction over the instant suit, in which [the] plaintiff alleges a breach of fiduciary duty." (citation and quotation marks omitted)). "[T]he Second Circuit long ago held that a former fiduciary lacks standing to claim a breach of ERISA's fiduciary duties." *Ello*, 531 F. Supp. 2d at 564 (citing *Chemung Canal Tr. Co. v. Sovran Bank/Md.*, 939 F.2d 12, 14 (2d Cir. 1991)). Because the Court finds that Plaintiffs fail to allege that any fiduciary actions were taken by Plaintiffs and seek remedies that are not available under Section 404 of ERISA, it need not address whether Plaintiffs, as former fiduciaries, who do not clearly allege that they are presently participants and beneficiaries, have standing.

agreement was also not a fiduciary act. "[T]he federal courts have determined that when a union is engaged in collective bargaining negotiations, the union is not bound by fiduciary duties." *Trs. of the Health & Welfare & Pension Funds of the Four Joint Bds. v. Schlesinger Bros., Inc.*, 931 F. Supp. 204, 209 (S.D.N.Y. 1996) (holding that union did not act in fiduciary role when it renegotiated an agreement and allegedly diverted funds from the benefits plan (citing *Amato v. W. Union Int'l*, 773 F.2d 1402, 1416–17 (2d Cir. 1985))). And the alleged misuse of the health funds was not a fiduciary act. "An employer acts as a fiduciary within the meaning of ERISA . . . only when fulfilling certain defined functions, including the exercise of discretionary authority or control over plan management or administration." *Siskind v. Sperry Ret. Program, Unisys.*, 47 F.3d 498, 505 (2d Cir. 1995); *cf. Harris Tr. & Savs. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28–29 (2d Cir. 2002) (holding that refusal to permit a request for an extra-contractual rollover was not discretionary, and therefore did not implicate fiduciary duties); *Gay v. Medi-Ray, Inc.*, 01-CV-8497, 2002 WL 34186938, at *6 (S.D.N.Y. July 26, 2002) (finding that alleged diversion of corporate profit-sharing plan assets would not constitute a breach of a fiduciary duty under ERISA). The crux of Plaintiffs' allegation is that Defendants deviated from the plan by funding treatments that were outside the plan—they did not have discretionary authority, or any authority, to do this—they were not acting in their capacity as fiduciaries of the Fund.

Even if Plaintiffs had alleged some fiduciary action on Defendants' part, Plaintiffs seek individualized remedies, "including but not limited to make-whole relief, including attorneys' fees and costs incurred in defense of the charges against [them]." (Ulrich PSAC ¶¶ 139, 143, 147; DeBellis PSAC ¶¶ 101, 105, 109.) They do not seek relief on behalf of the plan as they are required to in order to "bring a breach of fiduciary duty action pursuant to § 502(a)(2) of

ERISA." *Mcguigan*, 2011 WL 3421318, at *3; *see also Coan*, 457 F.3d at 259 (explaining that "sections 409 and 502(a)(2) of ERISA do not provide for the recovery of extra-contractual damages for breaches of fiduciary duty that affect only an individual plaintiff"); *Bona*, 2003 WL 1395932, at *9 ("Individual [p]laintiffs cannot recover damages on their own behalf under Section 502(a)(2).").[32]

Accordingly, Plaintiffs' PSACs do not state claims for a breach of fiduciary duties under Section 404 of ERISA and the proposed amendments are futile with respect to these claims.[33]

### III. Conclusion

For the foregoing reasons, the Court denies Ulrich and DeBellis's Motions to Amend as futile. Although Defendants did not at this stage renew their motions to dismiss pending the Courts' determination of the Motions to Amend, "[t]he Court has the authority to dismiss sua sponte a complaint, or a portion thereof, where the plaintiff presents no arguably meritorious issue." *Hudson v. Acker*, No. 12-CV-5548, 2012 WL 5359538, at *1 (S.D.N.Y. Nov. 1, 2012) (citation omitted); *see also Fitzgerald v. First E. Seventh St. Tenants Corp*., 221 F.3d 362, 363–64 (2d Cir. 2000) (holding that a district court may dismiss a frivolous complaint sua sponte even when the plaintiff has paid the required filing fee); *Pillay v. I.N.S.*, 45 F.3d 14, 17 (2d Cir. 1995) (per curiam) (holding that the court has "inherent authority" to dismiss a petition that presents

---

[32] Pension Fund Defendants also argue that Plaintiffs' claim against Defendant Lorenca is futile because he was not a fiduciary during any of the events alleged in the PSAC, as he began serving as a Pension Fund Trustee only on December 1, 2016. (Pension Fund Defs.' Mem. re Ulrich 13.) Because the Court dismisses all claims against the Pension Fund Defendants, it need not address whether claims against Defendant Lorenca would separately also be futile.

[33] Because the Court concludes that the proposed amendments are futile, it need not address Local 812's additional arguments that Plaintiffs PSACs were filed with undue delay and in bad faith, and that granting leave to amend would cause prejudice to Defendants. (Local 812 Defs.' Mem. re Ulrich 6–13; Local 812 Defs.' Mem. Re DeBellis 6–13.)

"no arguably meritorious issue").  The claims that the Court herein finds are futile and would not

survive a motion to dismiss, are therefore dismissed with prejudice.  *See Denny v. Barber*, 576

F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around");

*Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y.

Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the] [p]laintiff has already

had two bites at the apple, and they have proven fruitless" (citation, alteration, and quotation

marks omitted)).  The only surviving claims in Plaintiffs' Amended Complaints are therefore

Claims VIII, IX, and X, that were not amended and not considered here, and the NLRA causes of

action in Claims I and II that Plaintiffs deleted from their PSACs and that the Court therefore

also did not consider here.

Because all claims against Health Fund Defendants and Pension Fund Defendants are

dismissed with prejudice, the Clerk of the Court is respectfully directed to terminate the

following Defendants from both cases: Soft Drink & Brewery Workers Local 812 Health Fund;

Jeffrey Knatz, Thomas Starapoli, and Angel Martinez, each in his individual and official capacity

as Trustee of the Health Fund; the Soft Drink & Brewery Workers Local 812 Pension Fund; Rod

Brayman, Gerry Cottrell, and Michael Lorenca, each in his individual and official capacity as

Trustees of the Pension Fund.[34]  The following individuals are terminated from both cases *only*

in their capacity as Trustees of the Health Fund: James Surdi and John Visconti.  The following

individuals are terminated from both cases in their capacity as Trustees of the Pension Fund and

the Health Fund, but not in any other capacity: Edward Weber and Joseph Vitta.

---

[34] These Defendants are dismissed both in their individual and official capacities because
they were only named in these actions as Trustees of the Health and Pension Funds and are not
mentioned elsewhere in Plaintiffs' PSACs or filings as having had any personal involvement.

The Clerk of Court is respectfully directed to terminate the pending Motions. (Case No. 17-CV-4730 (Dkt. No. 53); Case No. 17-CV-5547 (Dkt. No. 45).) The Court will hold a Status Conference on April 5, 2019 at 3:00 p.m.

SO ORDERED.

DATED:    March **15**, 2019
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE